1    DAVID R. ZARO (BAR NO. 124334)
     JOSHUA A. DEL CASTILLO (BAR NO. 239015)
2    KEVIN D. LLOYD (BAR NO. 242863)
     MATTHEW D. PHAM (BAR NO. 287704)
3    ALLEN MATKINS LECK GAMBLE
         MALLORY & NATSIS LLP
4    865 South Figueroa Street, Suite 2800
     Los Angeles, California 90017-2543
5    Phone: (213) 622-5555
     Fax: (213) 620-8816
6    E-Mail: dzaro@allenmatkins.com
              jdelcastillo@allenmatkins.com
7              klloyd@allenmatkins.com
              mpham@allenmatkins.com
8
     Attorneys for Plaintiff
9    GEOFF WINKLER, RECEIVER

10                   UNITED STATES DISTRICT COURT

11                 CENTRAL DISTRICT OF CALIFORNIA

12

13   GEOFF WINKLER, Receiver,              Case No.   2:22-cv-0800

14                Plaintiff,               **COMPLAINT FOR**

15        vs.                              **(1) FRAUD;**
                                           **(2) BREACH OF FIDUCIARY DUTY;**
16   WILLIAM S. REYNER, JR., an            **(3) BREACH OF IMPLIED**
     individual; WILLIAM S. REYNER, JR.,   **COVENANT OF GOOD FAITH AND**
17   as trustee of the WILLIAM S. REYNER,  **FAIR DEALING;**
     JR. TRUST; REYNER FAMILY              **(4) CONSPIRACY TO COMMIT**
18   PARTNERS, L.P., a California limited  **FRAUD; AND**
     partnership; and WILLIAM S. REYNER    **(5) DECLARATORY RELIEF**
19   III, an individual,

20                Defendants.

21

22        Plaintiff Geoff Winkler (the "Receiver"), the Court-appointed permanent

23   receiver for Essex Capital Corporation ("Essex") and its subsidiaries and affiliates

24   (collectively, with Essex, the "Receivership Entities" or "Entities"), hereby brings

25   the following complaint (the "Complaint") against defendants (a) William

26   S. Reyner, Jr., in his individual capacity, (b) William S. Reyner, Jr., in his capacity

27   as trustee of the William S. Reyner, Jr. Trust, (c) Reyner Family Partners, L.P., and

28

(d) William S. Reyner III, in his individual capacity (collectively, the "<u>Defendants</u>").

In support of the Complaint, the Receiver alleges as follows:

## <u>JURISDICTION AND VENUE</u>

1.      This Court has jurisdiction over this civil action pursuant to 28 U.S.C. §§ 1345 and 1367(a) and the doctrines of ancillary and supplemental jurisdiction, in that this action arises from a common nucleus of operative facts as, and is substantially related to the original claims in, the enforcement action brought by the Securities and Exchange Commission (the "<u>SEC</u>"), captioned as *SEC v. Iannelli, et al.* and bearing Case No. 2:18-cv-05008-FMO-AFM (the "<u>SEC Action</u>"), which is currently pending before this Court.

2.      This Court may exercise personal jurisdiction over each of the Defendants pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure.

3.      Venue in the Central District of California is proper under 28 U.S.C. § 1391 because (a) this action is an ancillary proceeding to the SEC Action, which is pending in this district, and (b) the Receiver was appointed in this district and specifically authorized to "institute, pursue, and prosecute all claims and causes of action of whatever kind and nature that may now or hereafter exist as a result of the activities of [the Receivership Entities]" and to "institute . . . or become party to such actions or proceedings in state, federal, or foreign courts, which . . . the Receiver deems necessary and advisable to preserve or recover any [assets of the Receivership Entities]" pursuant to this Court's *Order Regarding Preliminary Injunction and Appointment of a Permanent Receiver* (the "<u>Appointment Order</u>"), entered on December 21, 2018, in the SEC Action, and such authority was reaffirmed by this Court's *Order Regarding Permanent Injunction* (the "<u>Permanent Injunction Order</u>") entered on September 9, 2019, in the SEC Action.

## <u>PARTIES</u>

4.      The Receiver is the duly-appointed permanent receiver for the Receivership Entities.  Among other things, the Appointment Order directed the

Receiver to, for the benefit of creditors of, and investors in, the Receivership Entities, recover and marshal any and all assets owned, leased, occupied, or otherwise controlled by the Receivership Entities (collectively, the "Receivership Assets" or "Assets"), and the Permanent Injunction Order reaffirmed the Receiver's rights and duties, including his authority to recover and marshal Receivership Assets.  Pursuant to the Appointment Order and Permanent Injunction Order, the Receiver enjoys exclusive authority and control over the Assets.

5.      By reason of the Membership Assignment (as that term is defined below) from Ralph T. Iannelli Jr. ("Iannelli") to the Receiver, (a) Iannelli's membership interest in 915 Elm Avenue CVL, LLC ("CVL") and all of his rights, title, and interests in property allocable to that membership interest, including any claims or causes of action allocable thereto, are Receivership Assets recovered by and now under the control of the Receiver, and (b) the Receiver, in his capacity as the receiver, holds a membership interest in CVL.

6.      Upon information and belief, William S. Reyner, Jr. ("Reyner") is an individual residing in the County of Santa Barbara, California, and Reyner is a manager of CVL.

7.      Upon information and belief, the William S. Reyner, Jr. Trust (the "Reyner Trust") is a trust established in California, of which Reyner is the trustee, and the Reyner Trust is a member of CVL.

8.      Upon information and belief, Reyner Family Partners, L.P. ("Reyner Family Partners") is a California limited partnership with its principal place of business in the County of Santa Barbara, California, and Reyner Family Partners is a member of CVL.

9.      Upon information and belief, William S. Reyner III ("Reyner III") is an individual residing in the County of Santa Barbara, California, and Reyner III is a member of CVL.

# GENERAL ALLEGATIONS

**I.    The Establishment of the Receivership Entities and Their Misappropriation of Investor Funds.**

10.    As alleged by the SEC in its complaint filed on June 3, 2019, in the SEC Action (the "SEC Complaint"), Iannelli has been Essex's president, chief executive officer, and sole shareholder since 1996.

11.    As alleged by the SEC in the SEC Complaint, Iannelli attracted investment into Essex through the sale of promissory notes, the returns on which were alleged to be based on the strength of Essex's equipment-leasing business, with Essex's leasing portfolio represented by Iannelli as generating sufficient income to fully offset its borrowing costs and obligations to noteholders.

12.    As alleged by the SEC in the SEC Complaint, between 2014 and early 2017, Essex's main source of funding was the money that it received from investor-funded promissory notes and investor-funded equity holdings in companies, not the income or revenue derived from its equipment-leasing business.

13.    As alleged by the SEC in the SEC Complaint, Essex was unable to cover the principal and interest obligations under the promissory notes that it owed to its investors using the revenue from its equipment-leasing business alone, so payments on existing obligations were instead made, in large part, from money infused by new investors, in a manner consistent with a Ponzi investment scheme.

14.    Based on his review and analysis of the available business and financial records of the Receivership Entities, the Receiver has concluded that the SEC's allegations from the SEC Complaint regarding Essex's unlawful conduct are largely accurate and that Essex and the other Receivership Entities were used, in part, to operate a Ponzi investment scheme.

**II.    The Receiver's Litigation Against CVL.**

15.    On January 29, 2021, the Receiver filed a complaint against CVL, commencing the civil action captioned as *Winkler v. 915 Elm Avenue CVL, LLC* and

bearing Case No. 2:21-cv-00869-FMO-AFM (the "CVL Action"), which is currently pending before this Court.

16.     In connection with the CVL Action, on October 15, 2021, the Receiver's counsel took the deposition of James Gally (the "Gally Deposition"), in which he provided testimony under penalty of perjury.  A true and correct copy of the relevant portions of the transcript of the Gally Deposition (the "Gally Deposition Transcript") is attached hereto as **Exhibit 1**.

17.     In connection with the CVL Action, on November 18, 2021, the Receiver's counsel took the deposition of Reyner (the "Reyner Deposition"), in which he provided testimony under penalty of perjury.  A true and correct copy of the relevant portions of the transcript of the Reyner Deposition (the "Reyner Deposition Transcript") is attached hereto as **Exhibit 2**.

18.     In connection with the CVL Action, on or about October 25, 2021, the Receiver served requests for admission on CVL (the "RFAs").  A true and correct copy of the RFAs is attached hereto as **Exhibit 3**.

19.     In connection with the CVL Action, on or about December 1, 2021, CVL served its responses to the Receiver's RFAs (the "RFA Responses").  Upon information and belief, Reyner executed a verification of the RFA Responses, in which he declared under penalty of perjury that he had read and verified the truthfulness of the RFA Responses.  A true and correct copy of the RFA Responses is attached hereto as **Exhibit 4**.

III.    **The Formation of CVL and the CVL Members' Contribution of Initial Capital.**

20.     Upon information and belief, in or about 2015, Iannelli and Reyner sought to acquire a lumber-yard business (the "Business") and the associated real property located at 915 Elm Avenue, Carpinteria, California 93013 (the "Real Property," and together, with the Business, the "Lumber Yard"), which were owned

by James Gally ("Gally") and his affiliated entities Carpinteria Valley Lumber Co. and J&G Clay Properties, LLC (collectively, with Gally, the "Gally Entities").

21.    Upon information and belief, in or about November 2015, in order to facilitate their acquisition of the Lumber Yard, Iannelli and Reyner formed CVL, a limited liability company that would be managed by the two of them and would stand in as the entity acquiring the Lumber Yard.

22.    Upon information and belief, at the time of its formation, five persons or entities were members of (i.e., held a membership interest in) CVL:  (a) Iannelli, (b) Ralph T. Iannelli III ("Iannelli III"), who is Iannelli's son, (c) the Reyner Trust, of which Reyner was (and continues to be) the trustee, (d) Reyner Family Partners, in which Reyner was the general partner, and (e) Reyner III, who is Reyner's son (collectively, the "CVL Members").

23.    Upon information and belief, in or about January 2016, the CVL Members made initial capital contributions to CVL in the following amounts and, in exchange, received and held the following proportionate percentage membership interests in CVL:

| CVL Member | Initial Capital Contribution | Percentage Membership Interest |
| --- | --- | --- |
| Iannelli | $619,590.00 | 57.0% |
| Iannelli III | $10,870.00 | 1.0% |
| Reyner Trust | $222,835.00 | 20.5% |
| Reyner Family Partners | $222,835.00 | 20.5% |
| Reyner III | $10,870.00 | 1.0% |
| | $1,087,000.00 | 100.0% |

Based on the above, at that time, the CVL Members affiliated with Iannelli (i.e., Iannelli and Iannelli III) (the "Iannelli Members") collectively held a 58% majority block of the membership interests in CVL, while the CVL Members affiliated with Reyner (i.e., the Reyner Trust, Reyner Family Partners, and Reyner III) (the "Reyner

Members") collectively held a 42% minority block of the membership interests in CVL.

24.    Upon information and belief, the initial capital contribution made by Iannelli to CVL was funded, at least in substantial part, with money diverted from Essex, including via the following transaction:  (a) on or about January 11, 2016, $500,000 was transferred from a bank account held by Essex to a bank account held by Iannelli; and (b) on or about January 13, 2016, $393,460 of that $500,000 was transferred from that bank account held by Iannelli to a bank account held by CVL.

## IV.    The CVL Members' Execution of CVL's Operating Agreement.

25.    Upon information and belief, in or about January 2016, the CVL Members executed an operating agreement for CVL (the "Operating Agreement"), which, among other things, governed how CVL would be managed and operated and outlined the rights and duties of its members and managers.  A true and correct copy of the Operating Agreement is attached hereto as **Exhibit 5**.

26.    Upon information and belief, CVL was formed as a manager-managed LLC, whereby CVL's managers would exclusively manage its business, property, and affairs, while CVL's members generally had no power to participate in its management.  On the role of CVL's managers, the Operating Agreement provided the following:

> **5.4    Exclusive Management by the Managers; Voting.**  The Company's business, property, and  affairs shall be managed exclusively by the Managers.  Except for situations in which the Members' approval is expressly required by the Articles or this Agreement; the Managers shall have full, complete, and exclusive authority, power, and discretion to manage and control the Company's business, property, and affairs, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business, property, and affairs.  Except as otherwise specifically set forth herein, any action, consent or approval called for or required by the Managers in this Agreement shall be valid only if approved by all of the Managers then in office (a) at a meeting of the Managers (held in person or by telephonic conference call), (b) by written consent or consents executed and delivered by the Managers, or (c) by email consents sent by the Managers.
>
> . . .

1

**5.9**    **Fiduciary Duties; Liability; Reliance of Manager.**  The
2  duty of care owed by the Members and Managers to the Company and
its Members consists solely of and is limited to refraining from
3  engaging in grossly negligent or reckless conduct, intentional
misconduct, or a knowing violation of law.  The duty of loyalty owed
4  by the Members and Managers to the Company and its Members
consists solely of and is limited to refraining from engaging in fraud or
5  deceit.  A Manager who so performs the duties of Manager shall not be
liable to the Company or to any Member for any loss or damage
6  sustained by the Company or any Member.  Except as expressly set
forth herein, no Member or Manager shall have any fiduciary or other
7  duty to the Company or any Member with respect to the business and
affairs of the Company.  In performing his or her duties, a Manager
8  shall be entitled to rely on information, opinions, reports, or
statements, including financial statements and other financial data, of
9  the following persons or groups unless the Manager has knowledge
concerning the matter in question that would cause such reliance to be
10  unwarranted and provided that the Manager acts in good faith and after
reasonable inquiry:
11

**5.9.1**  One or more officers, employees, agents or other
12  strategic advisors of the Company whom the Manager
reasonably believes to be reliable and competent in the matters
13  presented;

14  **5.9.2**  Any attorney, independent accountant, or other
person as to matters which the Manager reasonably believes to
15  be within such person's professional or expert competence; or

16  **5.9.3**  A committee upon which the Manager does not
serve, duly designated in accordance with a provision of the
17  Articles or this Agreement, as to matters within its designated
authority, which committee the Manager reasonably believes to
18  merit competence.

19
Ex. 5, at 131–32.
20
27.    The Operating Agreement designated Iannelli and Reyner as CVL's
21
initial managers and further laid out the following process in the event of an initial
22
manager's resignation:
23

24  **5.2**    **Resignation.**  Any Manager may resign at any time by
giving written notice to the Company.  The resignation of any Manager
25  shall take effect upon the receipt of that notice or such later time as
shall be specified in the notice; and, unless otherwise specified in the
26  notice, the acceptance of the resignation shall not be necessary to make
it effective.  The resignation of a Manager who is also a Member shall
27  not affect the Manager's rights as a Member and shall not constitute a
withdrawal of a Member.
28

**5.3   Removal; Vacancy.** . . . In the event of . . . the resignation of an Initial Manager, the remaining Initial Manager shall appoint a successor Manager; and such remaining Initial Manager shall have the right, in such individual's sole discretion, to remove and replace such successor Manager until such time as such remaining Initial Manager ceases to serve as a Manager. One the last remaining Initial Manager ceases to serve as a Manager, the Majority of the Members may appoint Managers, remove Managers and fill any managerial vacancy.

Ex. 5, at 130–31.

28.    Upon information and belief, the Operating Agreement incorrectly listed the amounts of the CVL Members' initial capital contributions but nevertheless accurately restated the percentages of their respective membership interests in CVL. With respect to the issue of additional capital contributions, the Operating Agreement provided the following:

**3.2   No Further Contributions.** No Member shall be required to make any additional capital contributions. If the Managers determine in good faith that (a) either the Company (i) has insufficient cash funds available to pay the Company's debts or obligations when and as they become due, or (ii) the Company requires additional capital for the Company, and funds are not reasonably available for such purposes from other sources, then the Manager may propose a call for additional contributions to the Company's capital on such terms and conditions as are determined by the Managers.

Ex. 5, at 128.

## V.    CVL's Purchase of the Lumber Yard and Incurrence of Related Debts.

29.    Upon information and belief, CVL's purchase of the Lumber Yard from the Gally Entities closed on or about January 14, 2016, with the final purchase price of $4,175,000, as adjusted to reflect the then-current value of the Gally Entities' inventory to be acquired by CVL.

30.    Upon information and belief, in addition to contributing its own cash (funded from the initial capital contributions made by the CVL Members), CVL's purchase of the Lumber Yard was also financed by (a) a $1,158,750 secured loan from lender Montecito Bank & Trust ("MB&T"), which CVL agreed to repay (the "8162 Loan") and (b) a $1,225,000 secured loan from MB&T, which CVL agreed to repay (the "8164 Loan," and together, with the 8162 Loan, the "MB&T Loans"), as

well as (c) a $1,500,000 unsecured "seller-carryback" loan from Gally, which Essex—*not CVL*—agreed to repay (the "Gally Loan"), notwithstanding the fact that Essex received no membership or other interest in CVL at the time the purchase of the Lumber Yard closed or at any other time.

31.    Additionally, upon information and belief, on account of $250,000 worth of inventory acquired by CVL but not immediately paid for upon the closing of CVL's purchase of the Lumber Yard, the Gally Entities and CVL agreed that CVL would pay $250,000 in principal, with 6% interest per annum, to the Gally Entities in two deferred payments (the "Gally Inventory Loan").  Upon information and belief, on the Gally Inventory Loan, CVL was obligated to make (a) the first deferred payment of $125,000, plus accrued interest, six months from the closing date (i.e., on or about July 14, 2016) and (b) the second deferred payment of $150,000, plus accrued interest, nine months from the closing date (i.e., on or about October 14, 2016).

32.    Upon information and belief, the Gally Loan was an indispensable source of financing that was needed for CVL's purchase of the Lumber Yard to successfully close as:  (a) CVL did not have any more available cash of its own that it could contribute to the purchase; (b) MB&T was not willing to lend money to CVL over the amounts of the MB&T Loans; and (c) CVL was not seeking any other sources of financing.

33.    Upon information and belief, CVL's repayment obligation to MB&T on account of the 8162 Loan was memorialized in a promissory note dated January 8, 2016 (the "8162 Note"), and secured by a deed of trust granting MB&T a security interest in the Real Property.  On its face, the 8162 Note, under which CVL promised to pay $1,158,750 in principal, with 4.75% interest, to MB&T, had a ten-year term and obligated CVL to make 119 monthly installment payments of $6,658 beginning on February 15, 2016, and a final balloon payment estimated at $858,844 due on January 15, 2026.

34.    Upon information and belief, CVL's repayment obligation to MB&T on account of the 8164 Loan was memorialized in a promissory note similarly dated January 8, 2016 (the "8164 Note," and together, with the 8162 Note, the "MB&T Notes"), and secured by a security agreement granting MB&T a security interest in most of CVL's personal property to be used in the Business.  On its face, the 8164 Note, under which CVL promised to pay $1,225,000 in principal, with 5.75% interest, to MB&T, also had a ten-year term and obligated CVL to make 120 monthly installment payments of $13,512 beginning on February 15, 2016, and through January 15, 2026.

35.    Upon information and belief, Essex's repayment obligation to Gally on account of the Gally Loan was memorialized in a promissory note dated January 14, 2016 (the "Essex-to-Gally Note"), which Reyner drafted and which was executed by Iannelli on behalf of Essex.  On its face, the Essex-to-Gally Note, under which Essex promised to pay $1,500,000 in principal, with 6% interest per annum, to Gally, had a three-year term and obligated Essex to pay $250,000 in principal on January 14, 2017, and the remaining $1,250,000 in principal on January 14, 2019, as well as any accrued interest to be paid on a quarterly basis.  A true and correct copy of the Essex-to-Gally Note is attached hereto as **Exhibit 6**.

36.    Upon information and belief, in exchange for Essex agreeing to repay Gally on the Gally Loan and entering into and incurring the obligations under the Essex-to-Gally Note, CVL agreed to repay Essex the sum of $1,500,000, plus interest, in a nearly corresponding manner.

37.    Upon information and belief, prior to Essex's execution of the Essex-to-Gally Note, Iannelli and Reyner discussed with one another the $1,500,000 "seller-carryback" loan proposed to Gally (that would ultimately take the form of the Gally Loan) and the structure of repaying that loan, including who would be obligated to make payments to whom, and those discussions led to:  (a) Essex, through Iannelli, agreeing to repay the $1,500,000 loan to Gally, but on the condition that CVL would

agree to repay Essex for what Essex repaid to Gally on that loan; and (b) Reyner, acting on behalf of CVL, representing to Iannelli and Essex that CVL agreed to repay $1,500,000 in principal, with interest, to Essex on terms similar to Essex's repayment terms to Gally.

38.    Upon information and belief, prior to the closing of CVL's purchase of the Lumber Yard, Iannelli and Reyner met with Gally and discussed with him the agreed-upon arrangement between CVL and Essex with respect to repaying the $1,500,000 "seller-carryback" loan proposed to Gally, including that Essex agreed to repay Gally on the loan and that CVL, in turn, agreed to repay Essex.

39.    In the Gally Deposition, Gally acknowledged that such a meeting and discussion took place:

> Q.  . . . Did you know about [the CVL-to-Essex Note's (as that term is defined below)] existence though before this deposition?
>
> A.  Yeah.  It was discussed at the meeting.  But I don't recall seeing this note.
>
> Q.  So when did you first learn about this note?
>
> A.  Well, it was discussed in one of the meetings beforehand . . . .
>
> Q.  And you don't recall specifically when that meeting occurred?
>
> A.  No.
>
> Q.  If you had to provide an estimate would you be able to do that?
>
> A.  Early 2016.  I have no idea.
>
> Q.  And you learned about the existence of this note at that meeting?
>
> A.  No.  We discussed the whole theory of how this was all going to work out . . . .
>
> Q.  And when you say you discussed the theory about how this was all going to work out, who did you discuss that with?
>
> A.  With Ralph [i.e., Ralph T. Ianelli Jr.], Bill [i.e., William S. Reyner, Jr.], and Dean [Moray].

Q.  And do you recall anything specifically about what was discussed?

A.  No.  Just in general sense.  It was about, you know, me carrying paper for the lumberyard purchase.  And it was going to be guaranteed by Ralph personally.  And on top of that it would be guaranteed by his corporation.  And the lumberyard [i.e., CVL] was to pay the same amount to Ralph.  So Ralph would be compensated for the amount of what the note to me was.  So it was kind of like a double security in my eyes.

Ex. 1, at 52–53 (Gally Dep. Tr. 46:4–47:12).

40.     Upon information and belief, but for CVL's agreement to repay Essex, Essex would not have entered into or incurred the obligations under the Essex-to-Gally Note or otherwise agreed to repay Gally on the Gally Loan, primarily due to a lack of any direct or indirect benefit or value to be received by Essex in exchange for taking such actions.

41.     Upon information and belief, in the absence of CVL's agreement to repay Essex, Essex would not be receiving any direct or indirect benefit for agreeing to repay Gally on the Gally Loan and entering into and incurring the obligations under the Essex-to-Gally Note given that:  (a) the Gally Loan was being obtained solely for the benefit of CVL, and not Essex (i.e., without the Gally Loan, CVL could not purchase the Lumber Yard); and (b) Essex never was or became a member in CVL and never held or received a membership or other interest in CVL.

42.     Upon information and belief, CVL's repayment obligation to Essex was memorialized in a promissory note also dated January 14, 2016 (the "CVL-to-Essex Note").  On its face, the CVL-to-Essex Note, under which CVL promised to pay $1,500,000 in principal, with 6% interest per annum, to Essex, had a three-year term but set forth payment terms that differed slightly from those in the Essex-to-Gally Note, obligating CVL to pay the entire $1,500,000 in principal, along with all accrued interest, on January 14, 2019.  A true and correct copy of the CVL-to-Essex Note is attached hereto as **Exhibit 7**.

43.    As acknowledged in the Reyner Deposition and RFA Responses, Reyner drafted and executed the CVL-to-Essex Note on behalf of CVL. *See* Ex. 2, at 74 (Reyner Dep. Tr. 36:11–13) ("A. . . . I did prepare it, I did sign it . . . ."); Ex. 4, at 106 (RFA Resps. 3:10–21) ("RESPONSE TO REQUEST FOR ADMISSION NO. 3[:]  . . . Subject to and without waiving the foregoing objections, Responding Party responds:  Admit that William S. Reyner Jr. signed the note attached as Exhibit 1 to PLAINTIFF's Complaint.").

44.    Upon information and belief, Reyner had drafted and executed the CVL-to-Essex Note on or before January 14, 2016, or, at a minimum, Reyner and Iannelli had finalized, and CVL had agreed to, the material terms of the CVL-to-Essex Note on or before January 14, 2016, based upon Reyner's acknowledgement of the material terms of the CVL-to-Essex Note on January 14, 2016.

45.    More specifically, upon information and belief, on January 14, 2016, Reyner sent an email to Reyner III, informing him that CVL's purchase of the Lumber Yard had closed and that, as a result, Reyner III needed to set up CVL's loans in its books and arrange for CVL to make payments on those loans via autopay.  In his email, in addition to identifying the 8164 Loan from MB&T (referred to therein as the "MBT Business Loan"), the 8162 Loan from MB&T (referred to therein as the "MB&T Real Estate Loan"), and the Gally Inventory Loan as CVL's loans, Reyner also identified the CVL-to-Essex Note as another one of CVL's loans on which it was obligated to repay:

> Essex Capital Loan
> $1,500,000 at 6% interest only for 3 years
> Ralph and I will discuss how to accrue/pay this.

Ex. 8, at 160.  Later, in his email, Reyner further noted, "This will require $347,000 per year of cash flow to cover payments and interest on the Essex loan." *Id.*  A true and correct copy of Reyner's email is attached hereto as **Exhibit 8**.

46.    However, in direct contradiction to what he stated in the above email on January 14, 2016, in the Reyner Deposition, Reyner later took the position that

the CVL-to-Essex Note only came into existence following a March 24, 2016, meeting with CVL's accountants, and as a result of their recommendation that a promissory note from CVL to Essex be created to resolve a discrepancy on CVL's balance sheet:

> A.  Okay.  So please let me correct my answer, if that's okay.  I — I was correct.  I did prepare it [i.e., the CVL-to-Essex Note], I did sign it, but it was signed in either the last week — sometime between the last week of March of 2016 and the end of April 2016.

> Q.  Okay.  So it was executed sometime in late March/early April —

> A.  Late March to, you know, April.

> Q.  Okay.  But you dated it January 14th, 2016?

> A.  I did.

> Q.  Why is it dated January 14th, 2016?

> A.  As I think we have seen earlier, the [CVL-to-Essex Note] came into being as a result of a request by CVL's accountants at a meeting on March 24th, 2016, and the reason for it was that we were trying to create the opening balance statement for the company.  And there was 1.5 million that was part of the purchase price but didn't -- it did not come from CVL.  It came by virtue of a note between Essex and the seller [i.e., the Essex-to-Gally Note].  And the accountant suggested that another note be created between CVL and Essex to reflect this missing gap of a million five, and I agreed to do that, and the easiest thing for me to do was to simply copy the Essex note with Mr. Gally, and so I did that and kept the date the same.

Ex. 2, at 74–75 (Reyner Dep. Tr. 36:11–37:10).  In other words, in the Reyner Deposition, Reyner denied that the CVL-to-Essex Note (or even its concept) existed on January 14, 2016, and then falsely testified that the CVL-to-Essex Note was created at the behest of CVL's accountants to fix an accounting discrepancy in CVL's books.

47.    Reyner did not intend for the CVL-to-Essex Note to be an enforceable promissory note or legal instrument at the time that he drafted and executed the CVL-Essex Note.  *See* Ex. 4, at 109 (RFA Resps. 6:7–21) ("REQUEST FOR ADMISSION NO. 8:  Admit that REYNER believed the CVL NOTE to be enforceable at the time it was executed.  RESPONSE TO REQUEST FOR

ADMISSION NO. 8:  . . . Subject to and without waiving the foregoing objections, Responding Party responds:  Deny.").  In other words, when Reyner executed the CVL-to-Essex Note on behalf of CVL, Reyner had no intention of binding CVL to the contractual obligations expressly set forth in the CVL-to-Essex Note.

48.    Upon information and belief, at no time prior to 2018 did Reyner inform Essex or Iannelli of Reyner's position that CVL was not contractually obligated to repay, and had no intention of repaying, Essex in accordance with the express terms of the CVL-to-Essex Note, and at no time prior to 2018 was Essex or Iannelli aware that Reyner had taken that position.

49.    Upon information and belief, in reliance on the existence of the CVL-to-Essex Note executed by Reyner and CVL's promise to pay Essex under the CVL-to-Essex Note, (a) Essex made payments to Gally pursuant to the Essex-to-Gally Note, totaling approximately $453,683.56, and (b) Essex made representations to MB&T regarding the existence of the CVL-to-Essex Note.  For example, upon information and belief, on April 18, 2017, Iannelli sent an email to MB&T, stating the following:

> Jim Gally the seller held a seller's note in the amount of 1.5 million at the time of closing.  The note is guaranteed by Essex.  That note has been paid down by $250,000.  Carp Valley [i.e., CVL] owes Essex 1.5 million and reimburses Essex for the interest it pays Gally. In addition Essex paid $250,000 as part of the purchase and sale agreement for inventory that was on the Carp Valley books.

Ex. 9, at 163.  A true and correct copy of the email exchange containing Iannelli's email is attached hereto as **Exhibit 9**.

50.    Upon information and belief, following its purchase of the Lumber Yard and execution of the CVL-to-Essex Note, CVL incurred additional debts to Essex and Iannelli.

51.    Upon information and belief, on or about July 12, 2016, CVL received a $125,000 loan allowing CVL to make the first deferred payment on the Gally

Inventory Loan that was coming due on July 14, 2016, and CVL agreed to repay that loan to Iannelli (the "Iannelli Inventory Loan").

52.    Upon information and belief, the Iannelli Inventory Loan to CVL was funded with money diverted from Essex:  (a) on or about July 12, 2016, $125,000 was transferred from a bank account held by Essex to a bank account held by Iannelli, and (b) on or about July 12, 2016, the entirety of that $125,000 was transferred from that bank account held by Iannelli to a bank account held by CVL.

53.    Upon information and belief, CVL's repayment obligation to Iannelli on account of the Iannelli Inventory Loan was memorialized in a promissory note dated July 11, 2016 (the "Iannelli Inventory Note"), which was executed by Reyner on behalf of CVL.  On its face, the Iannelli Inventory Note, under which CVL promised to pay $125,000 in principal, with 6% interest per annum, to Iannelli, had a two-year term and obligated CVL to pay the entire $125,000 in principal, along with all accrued interest, on July 11, 2018.  A true and correct copy of the Iannelli Inventory Note is attached hereto as **Exhibit 10**.

54.    Upon information and belief, on or about October 13, 2016, CVL received a second $125,000 loan allowing CVL to make the second deferred payment on the Gally Inventory Loan that was coming due on October 14, 2016, and CVL agreed to repay that loan to Essex (the "Essex Inventory Loan," and together, with the Iannelli Inventory Loan, the "Inventory Loans").

55.    Upon information and belief, the Essex Inventory Loan to CVL was funded with money diverted from Essex:  (a) on or about October 13, 2016, $125,000 was transferred from a bank account held by Essex to a bank account held by Iannelli, and (b) on or about October 13, 2016, the entirety of that $125,000 was transferred from that bank account held by Iannelli to a bank account held by CVL.

56.    Upon information and belief, CVL's repayment obligation to Essex on account of the Essex Inventory Loan was memorialized in a promissory note dated October 14, 2016 (the "Essex Inventory Note," and together, with the Iannelli

Inventory Note, the "<u>Inventory Notes</u>"), which was executed by Reyner on behalf of CVL. On its face, the Essex Inventory Note, under which CVL promised to pay $125,000 in principal, with interest, to Essex, had no fixed term and obligated CVL to pay the entire $125,000 in principal, along with all accrued interest, upon Essex's demand. A true and correct copy of the Essex Inventory Note is attached hereto as **Exhibit 11**.

57.    Reyner did not intend for the Essex Inventory Note to be an enforceable promissory note or legal instrument at the time of the execution of the Essex Inventory Note. *See* Ex. 4, at 117 (RFA Resps. 14:14–26) ("REQUEST FOR ADMISSION NO. 24: Admit that REYNER believed the SECOND CVL NOTE to be enforceable at the time it was executed. RESPONSE TO REQUEST FOR ADMISSION NO. 24: . . . Subject to and without waiving the foregoing objections, Responding Party responds: Deny."). In other words, when the Essex Inventory Note was executed, Reyner had no intention of binding CVL to the contractual obligations expressly set forth in the Essex Inventory Note.

58.    Upon information and belief, (a) the CVL-to-Essex Note matured by its terms on January 14, 2019, and is presently in default, (b) the Iannelli Inventory Note matured by its terms on July 11, 2018, and is presently in default, and (c) the Essex Inventory Note matured by its terms upon Essex's demand made in or about July 2018 and is presently in default.

**VI.    Reyner's Acts as the Purported Sole Manager of CVL.**

59.    On June 5, 2018, the SEC filed its complaint against Iannelli and Essex for securities fraud, commencing the SEC Action.

60.    Upon information and belief, on or about June 14, 2018, after learning about the SEC Action, Reyner pressured Iannelli to resign from his position as an initial manager of CVL, and Iannelli complied and resigned shortly thereafter, thereby making Reyner the only remaining initial manager of CVL.

61.     Upon information and belief, in violation of the Operating Agreement's requirement that Reyner appoint a successor manager in Iannelli's place, Reyner elected to manage CVL as its purported sole manager.

62.     Upon information and belief, at the time of Iannelli's resignation, the percentage membership interests in CVL held by the CVL Members had remained unchanged from the initial apportionment and were as follows:

| CVL Member | Percentage Membership Interest |
|---|---|
| Iannelli | 57.0% |
| Iannelli III | 1.0% |
| Reyner Trust | 20.5% |
| Reyner Family Partners | 20.5% |
| Reyner III | 1.0% |
| | **100.0%** |

63.     Upon information and belief, on or about July 16, 2018, Reyner, acting as the purported sole manager of CVL, adopted a written consent (the "First Written Consent"), a true and correct copy of which is attached hereto as **Exhibit 12**.

64.     As acknowledged in the Reyner Deposition and RFA Responses, Reyner drafted and executed the First Written Consent. *See* Ex. 2, at 83–84 (Reyner Depo. Tr. 81:22–82:14) ("Q.  Okay. Did you prepare this unanimous written consent?  A.  . . . I probably prepared the consent . . . .") ("Q.  Is that your signature? A.  Yes.") ("Q.  And is this UWC dated July 16th, 2018?  A.  Yes."); Ex. 4, at 111 (RFA Resps. 8:4–16) ("RESPONSE TO REQUEST FOR ADMISSION NO. 11:  . . . Subject to and without waiving the foregoing objections, Responding Party responds:  Admit that William S. Reyner, Jr. drafted a 'Unanimous Written Consent of Sole Manager of 915 Elm Avenue, CVL, LLC' that is dated to be effective on July 16, 2018.").

65.     By the First Written Consent, Reyner sought to have CVL raise $500,000 in capital by making two capital calls to the CVL Members:  (a) CVL

called for an initial $250,000 to be raised by no later than July 31, 2018, with the CVL Members called to contribute their pro rata share of $250,000 based upon their respective percentage membership interest in CVL (the "Initial Capital Call"); and (b) CVL called for an additional $250,000 to be raised upon 30 days' written notice to the CVL Members, to be issued by the majority of CVL's managers (i.e., effectively by Reyner, acting as the purported sole manager of CVL), on the same terms as the Initial Capital Call (the "Future Capital Call," and together, with the Initial Capital Call, the "Capital Calls").

66.    Upon information and belief, Reyner did not make any efforts to locate other reasonably available sources of capital prior to adopting the First Written Consent and making the Capital Calls, on behalf of CVL, to the CVL Members.

67.    Upon information and belief, at the time that he adopted the First Written Consent, Reyner knew that Iannelli would not be able to participate in the Capital Calls due to the pending SEC Action (which commenced less than two months prior to the adoption of the First Written Consent).

68.    Upon information and belief, in the First Written Consent, Reyner represented that the Capital Calls were necessary, in part, due to CVL's purported liquidity issues, specifically referencing (a) purported existing defaults under the MB&T Notes, (b) the impending maturity of the CVL-to-Essex Note on January 14, 2019, (c) the past maturity of the Iannelli Inventory Note, and (d) the impending maturity of the Essex Inventory Note (due to Essex's ability to make an immediate demand thereof).

69.    Upon information and belief, Reyner never disclosed that (a) he never intended for CVL to honor the CVL-to-Essex Note or the Inventory Notes or that (b) he planned for CVL to disclaim all debt obligations owed to Essex and to Iannelli once he, through the Reyner Members affiliated with him, gained majority membership control of CVL.

70.     Upon information and belief, prior to his adoption of the First Written Consent, Reyner, acting on behalf of CVL, had been negotiating with MB&T on the terms of a forbearance agreement with respect to the MB&T Notes, and Reyner specifically proposed to MB&T that Essex's anticipated default under the Essex-to-Gally Note (i.e., due to Essex's forthcoming failure to pay the outstanding balance due on that note on the January 14, 2019, maturity date) be waived by MB&T as a cross-default event under the MB&T Notes. Upon information and belief, Reyner, having never intended for CVL to honor the terms of the CVL-to-Essex Note (which, if honored, would have meant that CVL paid Essex the outstanding balance due on that note and allowed for Essex to pay off the outstanding balance due on the Essex-to-Gally Note), preemptively proposed this cross-default waiver to MB&T in order to avoid any adverse consequences to CVL with respect to the MB&T Notes, knowing that CVL would be defaulting under the CVL-to-Essex Note and causing Essex to default under the Essex-to-Gally Note. Upon information and belief, MB&T rejected Reyner's proposal.

71.     Upon information and belief, following MB&T rejection of Reyner's proposal regarding the cross-default waiver, Reyner, acting on behalf of CVL, continued negotiating with MB&T on the terms of a forbearance agreement with respect to the MB&T Notes and alternatively proposed to MB&T that Essex's anticipated default under the Essex-to-Gally Note be waived by MB&T as a cross-default event under the MB&T Notes, provided that CVL received and maintained at least $250,000 in new capital contributed by its members. The Receiver is without knowledge as to whether MB&T was amenable to Reyner's alternative proposal, but upon information and belief, MB&T and CVL never entered into a forbearance agreement with respect to the MB&T Notes.

72.     Upon information and belief, while preparing the First Written Consent, Reyner unilaterally decided that that money contributed in the Capital Calls by any of the CVL Members would have twice the value when determining

their reapportioned percentage membership interests in CVL.  In the end, the First Written Consent provided that for purposes of the Capital Calls, the valuation of CVL would be 50% of its valuation at the time of its formation, such that a member's capital contributions made in response to the Capital Calls would effectively have double the value when CVL reapportioned the respective percentage membership interests held by the CVL Members based on their total capital contributions.

73.    Upon information and belief, Reyner did not obtain a third-party, neutral valuation of CVL when determining that CVL's valuation for purposes of the Capital Calls would be 50% of its original valuation.

74.    Upon information and belief, the First Written Consent provided that based on their percentage membership interests in CVL, the CVL Members' proportionate capital contributions in response to each of the Capital Calls would be as follows:

| CVL Member | Percentage Membership Interest | Capital Contribution |
|---|---|---|
| Iannelli | 57.0% | $142,500.00 |
| Iannelli III | 1.0% | $2,500.00 |
| Reyner Trust | 20.5% | $51,250.00 |
| Reyner Family Partners | 20.5% | $51,250.00 |
| Reyner III | 1.0% | $2,500.00 |
| | **100.0%** | **$250,000.00** |

75.    Upon information and belief, shortly following his adoption of the First Written Consent, Reyner gave notice to the CVL Members of the First Written Consent and the Capital Calls, including their obligation to contribute capital in response to the Initial Capital Call.

76.    Upon information and belief, after receiving notice of the First Written Consent and the Capital Calls, Iannelli objected to the Initial Capital Call, claiming

1    that it was unnecessary and that CVL was being undervalued.  For example, upon

2    information and belief, on or about July 16, 2018 (i.e., the day that the First Written

3    Consent was adopted), Iannelli sent an email to Reyner, stating the following:

> Upon reviewing the [First Written Consent] it would appear that if I
> don't participate in the capital call my equity will be reduced to 37%.
> On the Capital Call I am somewhat surprised on the size of the call
> given that we have operated the business for 2.5 years with no need for
> additional capital let alone $500,000.  I respectfully do not agree with
> the rationale for the size of the call and can not [sic] agree about a 50%
> reduction of the valuation.

8    Ex. 13, at 181.  A true and correct copy of Iannelli's email is attached hereto as

9    **Exhibit 13**.

10         77.    Upon information and belief, on or about July 20, 2018, Iannelli sent

11   another email to Reyner and Brad Taylor (who is Reyner's son in law and

12   purportedly a manager of Reyner Family Partners, a member of CVL), again

13   expressing his disagreement regarding "the value of the company [CVL]" and "the

14   need, the amount and the motivation for the capital call."  Ex. 14, at 183.  A true and

15   correct copy of Iannelli's email is attached hereto as **Exhibit 14**.

16         78.    Upon information and belief, following Reyner's adoption of the First

17   Written Consent and notice to the CVL Members of the Initial Capital Call and their

18   obligation to contribute capital in response thereto, (a) all of the Reyner Members

19   (i.e., the Reyner Trust, Reyner Family Partners, and Reyner III) affirmatively

20   responded to the Initial Capital Call by contributing their proportionate shares of

21   $250,000 (i.e., $51,250, $51,250, and $2,500, respectively), totaling $105,000 in

22   capital contributed by the Reyner Members to CVL, while (b) neither of the Iannelli

23   Members (i.e., Iannelli and Iannelli III) responded to the Initial Capital Call, leaving

24   a $145,000 shortfall in the capital sought to be raised by CVL through the Initial

25   Capital Call.

26         79.    Upon information and belief, on or about August 8, 2018, Reyner,

27   acting as the purported sole manager of CVL, adopted a second written consent (the

28   "Second Written Consent").

80.    As acknowledged in the Reyner Deposition and RFA Responses, Reyner drafted and executed the Second Written Consent.  *See* Ex. 2, at 87 (Reyner Depo. Tr. 85:7–16) ("Q.  Did you prepare this unanimous written consent?  A.  Yes, I did.") ("Q.  Is that your signature?  A.  It is.") ("Q.  And is it — is this unanimous written consent dated August 8th, 2018?  A.  It is."); Ex. 4, at 111–12 (RFA Resps. 8:20–9:4) ("RESPONSE TO REQUEST FOR ADMISSION NO. 12:  . . . Subject to and without waiving the foregoing objections, Responding Party responds:  Admit that William S. Reyner, Jr. drafted a 'Unanimous Written Consent & Notice to Members of Capital Raise #1 from Sole Manager of 915 Elm Avenue, CVL, LLC' that is dated to be effective on August 8, 2018.").

81.    By the Second Written Consent, Reyner sought to have CVL raise the remaining $145,000 in capital not contributed by the Iannelli Members in response to the Initial Capital Call by allowing the Reyner Trust and Reyner Family Partners to each contribute $72,500 in additional capital to CVL.

82.    Upon information and belief, shortly following his adoption of the Second Written Consent, Reyner gave notice to the CVL Members of the Second Written Consent.  Upon information and belief, on or about August 9, 2018, Reyner, acting as the purported sole manager of CVL, sent a letter to the Iannelli Members informing them of the results of the Initial Capital Call and giving them notice and attaching a copy of the Second Written Consent.  The Second Written Consent indicated what the impact would be to the CVL Members' percentage membership interests in CVL following the full $250,000 capital contributions by the Reyner Members, including that Iannelli's membership interest would be reduced from 57% to 39.04%.  A true and correct copy of Reyner's letter, along with the attached Second Written Consent, is attached hereto as **Exhibit 15**.

83.    Upon information and belief, following Reyner's adoption and notice to the CVL Members of the Second Written Consent, the Reyner Trust and Reyner Family Partners each contributed $72,500 to CVL, resulting in CVL altogether

1  raising the entire $250,000 in capital sought to be raised by the Initial Capital Call—

2  all of which was contributed by only the Reyner Members.

3        84.    Upon information and belief, following its receipt of the $250,000 from

4  the Reyner Members, CVL, under the direction of Reyner, reapportioned the

5  percentage membership interests held by the CVL Members based upon (a) the total

6  additional capital contributed by each of the CVL Members in response to the Initial

7  Capital Call and (b) CVL's 50% valuation as set forth in the First Written Consent,

8  which resulted in the CVL Members holding membership interests in CVL in the

9  following new percentages:

10

| CVL Member | Additional Capital Contribution | New Percentage Membership Interest |
|---|---|---|
| Iannelli | $0.00 | 39.04% |
| Iannelli III | $0.00 | 0.68% |
| Reyner Trust | $123,750.00 | 29.64% |
| Reyner Family Partners | $123,750.00 | 29.64% |
| Reyner III | $2,500.00 | 1.00% |
| | **$250,000.00** | **100.00%** |

18  Based on the above, as a result of the reapportionment of the CVL Members'

19  percentage membership interests in CVL following the Initial Capital Call, the

20  Iannelli Members collectively held a roughly 40% minority block of the

21  membership interests in CVL (down from a 58% majority block), while the Reyner

22  Members collectively held a roughly 60% majority block of the membership

23  interests in CVL (up from a 42% minority block).

24        85.    Upon information and belief, the overall capital contributions made by

25  the CVL Members to CVL and change in their percentage membership interests in

26  CVL over the relevant period can be summarized as follows:

27  / / /

28  / / /

| CVL Member | Initial Capital Contribution | Additional Capital Contribution | Overall Capital Contribution |
|---|---|---|---|
| Iannelli | $619,590.00 | $0.00 | $619,590.00 |
| Iannelli III | $10,870.00 | $0.00 | $10,870.00 |
| Reyner Trust | $222,835.00 | $123,750.00 | $346,585.00 |
| Reyner Family Partners | $222,835.00 | $123,750.00 | $346,585.00 |
| Reyner III | $10,870.00 | $2,500.00 | $13,370.00 |
| | $1,087,000.00 | $250,000.00 | $1,337,000.00 |

| CVL Member | Original Percentage Membership Interest | New Percentage Membership Interest | Change in Percentage |
|---|---|---|---|
| Iannelli | 57.00% | 39.04% | -17.96% |
| Iannelli III | 1.00% | 0.68% | -0.32% |
| Reyner Trust | 20.50% | 29.64% | +9.14% |
| Reyner Family Partners | 20.50% | 29.64% | +9.14% |
| Reyner III | 1.00% | 1.00% | 0.00% |
| | 100.00% | 100.00% | 0.00% |

86.     Upon information and belief, following CVL's reapportionment of the percentage membership interests held by the CVL Members and with the Reyner Members now holding the majority block of the membership interests in CVL, Reyner, acting as the purported sole manager of CVL, determined that, notwithstanding the supposed liquidity issues facing CVL that originally necessitated the Capital Calls, CVL did not need to proceed with making the Future Capital Call to and raising an additional $250,000 from the CVL Members.

87.     Upon information and belief, Iannelli challenged the validity of the Capital Calls, characterizing them as unnecessary and pretextual and intended only for the purpose of strategically reducing his percentage membership interest in CVL and its attendant value and depriving Iannelli of a majority membership interest in CVL.

88.     The Receiver was subsequently informed by CVL's former accountants that the $250,000 raised from the Initial Capital Call went unused by CVL, thereby suggesting that the Capital Calls were, in fact, unnecessary and pretextual.

89.     Upon information and belief, on or about August 10, 2018, Seed Mackall LLP ("Seed Mackall"), counsel for Essex and Iannelli, sent a letter to CVL and Reyner informing them that the Inventory Notes due to Essex and Iannelli were past due and requesting that CVL pay the outstanding amounts due under the Inventory Notes.  A true and correct copy of Seed Mackall's letter is attached hereto as **Exhibit 16**.

90.     Upon information and belief, following CVL's reapportionment of the percentage membership interests held by the CVL Members and with the Reyner Members now holding the majority block of the membership interests in CVL, Reyner, acting as the purported sole manager of CVL, disclaimed all debt obligations owed to Essex and Iannelli.  Upon information and belief, on or about August 13, 2018, in response to Seed Mackall's August 10, 2018, letter, Reyner sent a letter to Seed Mackall informing it that the "two 'inventory loans' [i.e., the Inventory Notes] to [Iannelli] and Essex, along with the larger note to Essex in the amount of $1.5M [i.e., the CVL-to-Essex Note], were never intended to be repaid before the MB&T indebtedness [i.e., the MB&T Loans] . . . ."  Ex. 17, at 200.  A true and correct copy of Reyner's letter is attached hereto as **Exhibit 17**.

91.     Upon information and belief, with Iannelli having resigned as an initial manager (and Reyner thereafter becoming the purported sole manager of CVL) and the Initial Capital Call having taken place (and the Reyner Members thereafter holding a majority block of the membership interests in CVL), Reyner, acting as the purported sole manager of CVL, disavowed the enforceability of the CVL-to-Essex Note and the two Inventory Notes to Essex and Iannelli, and CVL has since declined to pay any amounts due under the CVL-to-Essex Note and the two Inventory Notes, notwithstanding the maturity of all three promissory notes.

/ / /

/ / /

/ / /

**VII.    The Assignment of Iannelli's Membership Interest to the Receiver.**

92.    In the performance of his duties outlined in the Appointment Order and Permanent Injunction Order, particularly his duty to recover Receivership Assets, the Receiver investigated transfers of money from Essex to Iannelli.

93.    From his investigation, the Receiver determined that the initial capital contribution made by Iannelli to CVL, a result of which Iannelli received his membership interest in CVL, was funded, wholly or in substantial part, with money diverted from Essex, without Iannelli providing adequate value to Essex in exchange therefor.

94.    As Essex's funding of Iannelli's initial capital contribution to CVL constituted a fraudulent transfer subject to avoidance or recovery, on or about May 8, 2019, the Receiver made a demand on Iannelli to assign his membership interest in CVL to the Receiver.

95.    On or about July 28, 2020, by written agreement duly executed by Iannelli and the Receiver, Iannelli assigned to the Receiver, for the benefit of creditors of, and investors in, the Receivership Entities, all of Iannelli's membership interest in CVL, as well as all of his rights, title, and interests in any property allocable to that membership interest (collectively, the "Membership Assignment"), and the Receiver accepted the assignment.  Specifically, the Membership Assignment contemplated Iannelli's absolute and unconditional assignment to the Receiver of the following:

> all of [Iannelli's] rights, title and interest in and to [CVL] including, without limitation, [Iannelli's] interest as a member of [CVL] and all of [Iannelli's] rights, title, and Interest [sic] in and to the properties (real and personal, tangible or intangible, known or unknown, liquidated or unliquidated, absolute or contingent), management rights, capital, capital accounts, cash flow, distributions, profits and losses, and all other economic benefits of [CVL] allocable to [Iannelli's membership interest in CVL].

96.    Upon the Membership Assignment, (a) Iannelli's membership interest in CVL and all of his rights, title, and interests in property allocable to that

membership interest, including any claims or causes of action allocable thereto,
became Receivership Assets recovered by and under the control of the Receiver, and
(b) the Receiver came to hold, and continues to hold, a membership interest in CVL.

**FIRST CLAIM FOR RELIEF**

**(For Fraud)**

**(Against William S. Reyner, Jr.)**

97.    The Receiver incorporates herein by reference, as though fully set forth
herein, the allegations contained in paragraphs 1 through 96, inclusive.

98.    Upon information and belief, Reyner, while acting as a manager of
CVL, made false representations of material facts to and concealed material facts
from Essex concerning CVL's agreement to repay Essex (in connection with Essex's
agreement to repay Gally on the Gally Loan) and the CVL-to-Essex Note, including,
among other things:

a.    Representing that CVL agreed to repay $1,500,000 in principal,
with interest, to Essex on terms similar to Essex's repayment terms to Gally,
when Reyner had no intention of having CVL do so;

b.    Concealing that he did not believe the CVL-to-Essex Note to be
an enforceable promissory note or legal instrument, including at the time of
his execution of the CVL-to-Essex Note on behalf of CVL; and

c.    Concealing that he had no intention of having CVL repay Essex
in accordance with the express terms of the CVL-to-Essex Note.

99.    Upon information and belief, Reyner knew that his representations of
material facts to Essex were false when he made them and that the material facts
concealed from Essex were not known by Essex, and Reyner made his false
representations of material facts to and concealed material facts from Essex with the
intent to defraud or deceive Essex, specifically with the intent of inducing Essex to
agree to repay Gally on the Gally Loan and enter into and incur the obligations

1  under the Essex-to-Gally Note, in order to facilitate CVL's purchase of the Lumber
2  Yard.

3        100.   Upon information and belief, Essex did not know the truth of Reyner's
4  false representations or of the material facts concealed by Reyner, and Essex would
5  not have entered into or incurred the obligations under the Essex-to-Gally Note or
6  otherwise agreed to repay Gally on the Gally Loan had the truth of the material facts
7  been disclosed.

8        101.   Upon information and belief, Essex reasonably relied on Reyner's false
9  representations and concealment by (a) agreeing to repay Gally on the Gally Loan,
10 (b) entering into and incurring the obligations under the Essex-to-Gally Note, and
11 (c) making payments totaling approximately $453,683.56 to Gally pursuant to the
12 Essex-to-Gally Note, and Essex's reliance was reasonable in that Reyner was
13 managing CVL together with Iannelli, the principal of Essex, and Essex had no
14 reason to believe that Reyner would defraud or deceive it.  Reyner's false
15 representations and concealment of material facts were a substantial factor in
16 causing harm to Essex.

17       102.   As a direct and proximate result of Reyner's conduct described herein,
18 Essex has suffered substantial harm, with Reyner's fraud perpetrated on Essex,
19 among other things, causing Essex to incur a liability to Gally (i.e., the obligations
20 under the Essex-to-Gally Note), on account of which:  (a) Essex has made payments
21 and remains liable to Gally; and (b) Gally has submitted a proof of claim and will be
22 entitled to receive a distribution from the receivership estate.  The amount of harm
23 directly and proximately caused by Reyner's conduct will be proven at trial.

24                        **SECOND CLAIM FOR RELIEF**
25                        **(For Breach of Fiduciary Duty)**
26                        **(Against William S. Reyner, Jr.)**

27       103.   The Receiver incorporates herein by reference, as though fully set forth
28 herein, the allegations contained in paragraphs 1 through 102, inclusive.

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

4873-6768-3332.15                              -30-

104.   As a manager of CVL, Reyner owed fiduciary duties of care, loyalty, and good faith to the members of CVL, including to Iannelli (prior to the Membership Assignment).  Reyner's fiduciary duties include, among other things, exercising good business judgment, acting prudently in the operation of CVL's business, discharging his actions in good faith, acting in the best interests of CVL and its members, and putting the interests of CVL and its members before his own.

105.   Reyner, while acting as a manager of CVL, breached his fiduciary duties to Iannelli by, among other things, taking the following actions or inactions:

a.    Declining to appoint a successor manager of CVL after Iannelli's resignation as an initial manager and continuing to manage CVL as its purported sole manager in contravention of the express provisions of the Operating Agreement;

b.    Proposing that CVL raise capital by making the Capital Calls to the CVL Members, without making any efforts to locate other reasonably available sources of capital prior thereto;

c.    Proposing that CVL raise capital by making the Capital Calls to the CVL Members in the absence of a legitimate liquidity issue;

d.    Proposing that CVL make the Capital Calls as a pretext to gain majority membership control of CVL;

e.    Suggesting in the First Written Consent that the past or forthcoming maturities on the CVL-to-Essex Note and Inventory Notes were part of CVL's purported liquidity issues, while failing to disclose that he had no intention of having CVL honor those promissory notes;

f.    Reapportioning the percentage membership interests in CVL held by the CVL Members on account of the additional capital contributed in response to the Initial Capital Call, which capital call was unnecessary due to the absence of a legitimate liquidity issue; and

g.      Reapportioning the percentage membership interests in CVL
held by the CVL Members on account of the additional capital contributed in
response to the Initial Capital Call, which reapportionment was based upon a
valuation of CVL that was not supported by a third-party, neutral valuation.

106.   As a direct and proximate result of Reyner's conduct described herein,
the CVL membership interest originally held by Iannelli, and now held by the
Receiver, has been subjected to substantial harm, with Reyner's breaches of his
fiduciary duties, among other things, improperly reducing the original percentage of
that membership interest in CVL and of majority membership control of CVL, along
with the rights and powers associated therewith.  The amount of harm directly and
proximately caused by Reyner's conduct will be proven at trial.

## THIRD CLAIM FOR RELIEF

### (For Breach of Implied Covenant of Good Faith and Fair Dealing)
### (Against William S. Reyner, Jr.)

107.   The Receiver incorporates herein by reference, as though fully set forth
herein, the allegations contained in paragraphs 1 through 106, inclusive.

108.   Under California law, implied in every contract, including the
Operating Agreement, is a covenant of good faith and fair dealing, meaning that
each party subject to the contract will not do anything to unfairly interfere with the
right of any other party to receive the benefit of the contract.  By accepting the
position of a manager of CVL, Reyner was bound by the terms of the Operating
Agreement, and, as a result, the implied covenant of good faith and fair dealing
applies to Reyner.

109.   By virtue of the relationship between Reyner, as a manager of CVL,
and Iannelli, as a member of CVL (prior to the Membership Assignment), Iannelli
placed trust and confidence in Reyner to perform all of the duties and obligations
owed by and reasonably expected of a manager pursuant to the terms of the
Operating Agreement and to honor the implied covenant to act in good faith and to

1 | not take any action that would unduly or unreasonably impair rights or benefits
2 | owed to or expected for a member of CVL under the Operating Agreement.

3 |      110.   At all times relevant herein, Iannelli performed all or substantially all
4 | of its obligations required of a member of CVL under the Operating Agreement
5 | (including making the initial capital contribution to CVL), except for those
6 | obligations that have been waived or excused by Reyner's conduct (such as
7 | responding to the Initial Capital Call).

8 |      111.   Reyner breached the implied covenant of good faith and fair dealing to
9 | Iannelli by, among other things, taking the following actions or inactions, none of
10 | which were fair or taken in good faith:

11 |           a.    Declining to appoint a successor manager of CVL after Iannelli's
12 | resignation as an initial manager and continuing to manage CVL as its
13 | purported sole manager in contravention of the express provisions of the
14 | Operating Agreement;

15 |           b.    Proposing that CVL raise capital by making the Capital Calls to
16 | the CVL Members, without making any efforts to locate other reasonably
17 | available sources of capital prior thereto;

18 |           c.    Proposing that CVL raise capital by making the Capital Calls to
19 | the CVL Members in the absence of a legitimate liquidity issue;

20 |           d.    Suggesting in the First Written Consent that the past or
21 | forthcoming maturities on the CVL-to-Essex Note and Inventory Notes were
22 | part of CVL's purported liquidity issues, while failing to disclose that he had
23 | no intention of having CVL honor those promissory notes;

24 |           e.    Reapportioning the percentage membership interests in CVL
25 | held by the CVL Members on account of the additional capital contributed in
26 | response to the Initial Capital Call, which capital call was unnecessary due to
27 | the absence of a legitimate liquidity issue; and

28 |

f.     Reapportioning the percentage membership interests in CVL held by the CVL Members on account of the additional capital contributed in response to the Initial Capital Call, which reapportionment was based upon a new, reduced valuation of CVL at 50% of its original valuation that was not supported by a third-party, neutral valuation.

112.   As a direct and proximate result of Reyner's conduct described herein, the CVL membership interest originally held by Iannelli, and now held by the Receiver, has been subjected to substantial harm, with Reyner's breaches of his fiduciary duties, among other things, improperly reducing the original percentage of that membership interest in CVL and of majority membership control of CVL, along with the rights and powers associated therewith.  The amount of harm directly and proximately caused by Reyner's conduct will be proven at trial.

## FOURTH CLAIM FOR RELIEF

### (For Conspiracy to Commit Fraud)

### (Against William S. Reyner, Jr.)

113.   The Receiver incorporates herein by reference, as though fully set forth herein, the allegations contained in paragraphs 1 through 112, inclusive.

114.   Upon information and belief, Reyner has alleged that, prior to Essex agreeing to repay Gally on the Gally Loan, Reyner and Iannelli reached an agreement with one another, in which they agreed that (a) CVL would promise to repay Essex for what Essex repaid to Gally, including by executing a promissory note to that effect (i.e., what would eventually be the CVL-to-Essex Note), but that (b) CVL, in actuality, would not be bound by that promise or, at a minimum, would not be bound to the contractual obligations expressly set forth in the promissory note executed by CVL, and that (c) the "actual" terms of CVL's repayment obligation to Essex, as understood between Reyner and Iannelli, would not be memorialized in that promissory note or any other written instrument executed by CVL.  Under such scenario as alleged by Reyner, Reyner and Iannelli conspired to defraud Essex.

115.   Upon information and belief, Iannelli made false representations of material facts to and concealed material facts from Essex concerning CVL's agreement to repay Essex (in connection with Essex's agreement to repay Gally on the Gally Loan) and the CVL-to-Essex Note, including, among other things,

    a.    Representing that CVL agreed to repay $1,500,000 in principal, with interest, to Essex on terms similar to Essex's repayment terms to Gally, when CVL had no intention of doing so;

    b.    Concealing that CVL did not believe the CVL-to-Essex Note to be an enforceable promissory note or legal instrument, including at the time of the execution of the CVL-to-Essex Note;

    c.    Concealing that CVL had no intention of repaying Essex in accordance with the express terms of the CVL-to-Essex Note; and

    d.    Concealing the "actual" terms of CVL's repayment obligation to Essex, as agreed upon and understood by him and Reyner and the fact that such terms would not be memorialized in the CVL-to-Essex Note or any other written instrument.

116.   Upon information and belief, Iannelli knew that his representations of material facts to Essex were false when he made them and that the material facts concealed from Essex were not known by Essex, and Iannelli made his false representations of material facts to and concealed material facts from Essex with the intent to defraud or deceive Essex, specifically with the intent of inducing Essex to agree to repay Gally on the Gally Loan and enter into and incur the obligations under the Essex-to-Gally Note, in order to facilitate CVL's purchase of the Lumber Yard.

117.   Upon information and belief, Essex did not know the truth of Iannelli's false representations or of the material facts concealed by Iannelli, and Essex would not have agreed to repay Gally on the Gally Loan or enter into or incur the

1  obligations under the Essex-to-Gally Note had the truth of the material facts been

2  disclosed.

3     118.  Upon information and belief, Essex reasonably relied on Iannelli's false

4  representations and concealment by (a) agreeing to repay Gally on the Gally Loan,

5  (b) entering into and incurring the obligations under the Essex-to-Gally Note, and

6  (c) making payments totaling approximately $453,683.56 to Gally pursuant to the

7  Essex-to-Gally Note, and Essex's reliance was reasonable in that Iannelli was the

8  principal of Essex and Essex had no reason to believe that Iannelli would defraud or

9  deceive it.  Iannelli's false representations and concealment of material facts were a

10  substantial factor in causing harm to Essex.

11     119.  Upon information and belief, at all times that Iannelli made the false

12  representations of material facts to or concealed material facts from Essex, Reyner

13  knew that Iannelli intended to defraud or deceive Essex and cooperated with Iannelli

14  to perpetrate the fraud on Essex.

15     120.  Upon information and belief, Reyner cooperated with Iannelli to

16  perpetrate the fraud on Essex by, among other things,

17       a.     Representing to Essex, prior to Essex agreeing to repay Gally on

18       the Gally Loan, that CVL agreed to repay $1,500,000 in principal, with

19       interest, to Essex on terms similar to Essex's repayment terms to Gally;

20       b.     Drafting and executing the CVL-to-Essex Note;

21       c.     Concealing from Essex that neither he nor CVL intended for the

22       CVL-to-Essex Note to be an enforceable promissory note or legal instrument,

23       including at the time of his execution of the CVL-to-Essex Note, *see* Ex. 4, at

24       106 (RFA Resps. 6:7–21); Ex. 4, at 105–06 (RFA Resps. 5:21–6:6)

25       ("REQUEST FOR ADMISSION NO. 7:  Admit that YOU believed the CVL

26       NOTE to be enforceable at the time it was executed.  RESPONSE TO

27       REQUEST FOR ADMISSION NO. 7:  . . . Subject to and without waiving

28       the foregoing objections, Responding Party responds:  Deny.");

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

4873-6768-3332.15                        -36-

d.    Concealing from Essex that CVL had no intention of repaying Essex in accordance with the express terms of the CVL-to-Essex Note; and

e.    Concealing from Essex the "actual" terms of CVL's repayment obligation to Essex, as agreed upon and understood by him and Iannelli and the fact that such terms would not be memorialized in the CVL-to-Essex Note or any other written instrument.

121.   As a direct and proximate result of Reyner's conduct described herein, Essex has suffered substantial harm, with Reyner's conspiracy and cooperating in perpetrating Iannelli's fraud on Essex, among other things, causing Essex to incur a liability to Gally (i.e., the obligations under the Essex-to-Gally Note), on account of which:  (a) Essex has made payments and remains liable to Gally; and (b) Gally has submitted a proof of claim and will be entitled to receive a distribution from the receivership estate.  The amount of harm directly and proximately caused by Reyner's conduct will be proven at trial.

## FIFTH CLAIM FOR RELIEF

### (For Declaratory Relief)

### (Against All Defendants)

122.   The Receiver incorporates herein by reference, as though fully set forth herein, the allegations contained in paragraphs 1 through 121, inclusive.

123.   Upon information and belief, an actual, present, and justiciable controversy has arisen and now exists between the Receiver, as the holder of a membership interest in CVL and the assignee of Iannelli's membership interest in CVL and the claims and causes of action allocable thereto (following the Membership Assignment), and the Defendants concerning the propriety and validity of the Initial Capital Call and the resulting reapportionment of the CVL Members' percentage membership interests in CVL, including the reduction of Iannelli's (and now the receivership's) percentage membership interest from 57% to 39.04%.

124.    The Receiver asserts that the Initial Capital Call and the resulting reapportionment of the CVL Members' percentage membership interests in CVL were unnecessary and pretextual and made purposefully and improperly for the purposes of reducing Iannelli's percentage membership interest from a majority percentage to a minority percentage and increasing the percentage membership interests held by the Reyner Members from a combined minority percentage to a combined majority percentage, thereby giving Reyner and those parties affiliated with him both manager- and member-level control of CVL.

125.    The Receiver is informed and believes, and thereon alleges, that Reyner and the Reyner Members contend that the Initial Capital Call and the resulting reapportionment of the CVL Members' percentage membership interests in CVL were legitimate acts made within the scope of Reyner's duties as a manager of CVL.

126.    The Receiver therefore desires and requests a judicial determination and declaration of the respective rights, duties, and obligations of the Receiver and the Defendants with respect to the contentions set forth above.  Such determination and declaration are necessary and appropriate at this time so that the respective, rights, duties, and obligations of the parties are ascertained and complied with on a current and going-forward basis and in order to resolve any potential future claims between the parties.  The Receiver desires and requests a judicial determination and declaration regarding the validity of the Initial Capital Call, the validity of the reapportionment of the CVL Members' percentage membership interests in CVL, and the percentage of the membership interest in CVL originally held by Iannelli and now held by the Receiver as assignee thereof—and, more specifically, requests that the Court declare that the Initial Capital Call and resulting reapportionment were invalid and that the Receiver, as assignee, continues to hold a 57% membership interest in CVL.

/ / /

/ / /

## **PRAYER FOR RELIEF**

WHEREFORE, the Receiver prays for judgment against the Defendants and in favor of the Receiver as follows:

**On the First, Second, Third, and Fourth Claims for Relief:**

1.    For damages in an amount according to proof at trial;

2.    For prejudgment interest as allowed by law;

**On the Third and Fourth Claims for Relief:**

3.    For injunctive relief requiring the removal of Reyner as a manager of CVL and authorizing the appointment of the Receiver as a manager of CVL;

**On the Fifth Claim for Relief:**

4.    For declaratory relief as requested herein;

**On All Claims for Relief:**

5.    For recovery of costs of suit and reasonable attorneys' fees; and

6.    For such other and further relief as the Court deems just and proper.

Dated:  February 4, 2022

ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
DAVID R. ZARO
JOSHUA A. DEL CASTILLO
KEVIN D. LLOYD
MATTHEW D. PHAM


By:_____/s/ Matthew D. Pham_____
       MATTHEW D. PHAM
       Attorneys for Plaintiff
       GEOFF WINKLER, Receiver