1 | DAVID R. ZARO (BAR NO. 124334)
2 | JOSHUA A. DEL CASTILLO (BAR NO. 239015)
  | MATTHEW D. PHAM (BAR NO. 287704)
3 | ALLEN MATKINS LECK GAMBLE
  |   MALLORY & NATSIS LLP
4 | 865 South Figueroa Street, Suite 2800
  | Los Angeles, California 90017-2543
5 | Phone: (213) 622-5555
  | Fax: (213) 620-8816
6 | E-Mail: dzaro@allenmatkins.com
  |   jdelcastillo@allenmatkins.com
7 |   mpham@allenmatkins.com

*filed in case 2:22-cv-0800-FMO (AFMx) per court's order

8 | Attorneys for Receiver
  | GEOFF WINKLER

9 |

UNITED STATES DISTRICT COURT

10 |

CENTRAL DISTRICT OF CALIFORNIA

11 |

WESTERN DIVISION

12 | SECURITIES AND EXCHANGE
   | COMMISSION,

Case No. 2:18-cv-05008-FMO-AFM

13 |              Plaintiff,

NOTICE OF MOTION AND MOTION
OF RECEIVER, GEOFF WINKLER,
FOR ORDER APPROVING AND
AUTHORIZING PERFORMANCE OF
SETTLEMENT AGREEMENT;
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT
THEREOF

14 |       v.

15 | RALPH T. IANNELLI and ESSEX
   | CAPITAL CORP.,

16 |

17 |              Defendants.

[Declaration of Geoff Winkler; and
[Proposed] Order submitted concurrently
herewith]

18 |

19 |

Date:   October 6, 2022
Time:  10:00 a.m.
Ctrm:  6D
Judge Hon. Fernando M. Olguin

20 |

21 |

22 |

23 | **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

24 |     **PLEASE TAKE NOTICE** that on October 6, 2022 in Courtroom 6D of the

25 | above-entitled Court, located at 350 W. 1st Street, Los Angeles, CA 90012, Geoff

26 | Winkler, the Court-appointed permanent receiver (the "Receiver") for Essex Capital

27 | Corporation, and its subsidiaries and affiliates (collectively, the "Receivership

28 | Entities") will move the Court for an order approving the Receiver's settlement of

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

4885-6325-1760

the litigation styled <u>Winkler v. 915 Elm Avenue CVL, LLC</u>, Case No. 2:21-cv-00869-FMO-AFM (the "CVL Action") and <u>Winkler v. Reyner, et al.</u>, Case No. 2:22-cv-0800-FMO-AFM (the "Second Action"), and authorizing the parties to the settlement agreement memorializing the resolution of the CVL Action and Second Action to perform their respective obligations thereunder.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently filed Declaration of Geoff Winkler, the relevant Settlement Agreement, the documents and pleadings already on file in this action, and upon such further oral and documentary evidence as may be presented at the time of hearing.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which commenced on August 15, 2022.

Dated:  September 7, 2022

ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
DAVID R. ZARO
JOSHUA A. DEL CASTILLO
MATTHEW D. PHAM

By:    /s/    Joshua A. del Castillo
JOSHUA A. DEL CASTILLO
Attorneys for Receiver
GEOFF WINKLER

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    <u>INTRODUCTION.</u>**

3    By this Motion, Geoff Winkler, the Court-appointed permanent receiver (the

4    "Receiver") for Essex Capital Corporation ("Essex"), and its subsidiaries and

5    affiliates (again, with Essex, the "Receivership Entities"), seeks Court approval of a

6    negotiated settlement with 915 Elm Avenue CVL, LLC ("CVL"), William S.

7    Reyner, Jr., William S. Reyner III, the William S. Reyner, Jr. Trust, and Reyner

8    Family Partners, L.P. (collectively, but not including CVL, the "Reyner Parties"), in

9    order to resolve, fully and completely, the CVL Action and the Second Action.

10    As detailed herein, the Receiver has weighed the costs and benefits of

11    continued litigation with the CVL and the Reyner Parties and has determined, in his

12    reasonable business judgment, that the proposed settlement is in the best interest of

13    the receivership estate because it will:  (1) result in the recovery of $1.1 million for

14    the benefit of the Receivership Entities and their estate, an amount reflecting 100%

15    of the funds which the Receiver initially alleged were wrongfully diverted from

16    Essex; and (2) definitively resolve what has proved to be complex and costly

17    litigation of prolonged duration.  The Receiver therefore respectfully submits that

18    the settlement is appropriate and beneficial for the Receivership Entities, and

19    requests that the Court authorize and approve the settlement, as memorialized by the

20    concurrently submitted Settlement Agreement and Mutual Release, a copy of which

21    is attached to the concurrently filed Declaration of Geoff Winkler (the "Winkler

22    Decl.") as <u>**Exhibit A**</u>.

23    **II.    <u>RELEVANT FACTUAL BACKGROUND.</u>**

24    **A.    The Receiver's Appointment.**

25    On or about June 5, 2018, the Plaintiff Securities and Exchange Commission

26    (the "Commission") filed its Complaint against Defendants Ralph T. Iannelli and

27    Essex.  (<u>ECF No. 1</u>.)  On December 21, 2018, the Court entered its Order Regarding

28    Preliminary Injunction and Appointment of a Permanent Receiver, pursuant to

which the Receiver was appointed and vested with exclusive authority and control

over the Receivership Entities, including with respect to prosecuting claims intended

to result in the recovery of funds for the benefit of the Receivership Entities.

(ECF No. 66.)  The Court's later September 9, 2019 Order Regarding Permanent

Injunction (ECF No. 113) reaffirmed the Receiver's powers and duties.

**B.    The CVL Transaction.**

In the course of his investigation and analysis of the business and financial

activities of the Receivership Entities, the Receiver concluded that hundreds of

thousands in Receivership Entity funds had been wrongfully diverted by Essex's

principal, Ralph Iannelli, Jr. to a transaction pursuant to which Mr. Iannelli obtained

an (initially, majority) interest in CVL, and CVL purchased a lumber yard operation

and associated real and personal property (collectively, the "Lumber Yard") located

in Carpinteria, California.  (Winkler Decl. ¶ 2.)  The Receiver further concluded that,

not only had Receivership Entity funds been diverted to a transaction which

benefitted only Mr. Iannelli, in his personal capacity, but more than $450,000 in

additional Receivership Entity funds had been used to retire a portion of a

$1.5 million debt that Mr. Iannelli caused Essex – which did not receive any interest

in or benefit from the CVL transaction – to incur.  (Id.)  The Receiver also

concluded that this $1.5 million debt was mirrored by a note from CVL and payable

to Essex in the face amount of $1.5 million, what had come due by the time of his

appointment but which had not been repaid.  (Id.)

**C.    The Receiver's Claims Against CVL.**

On December 5, 2019, the Receiver petitioned the Court for authority

commence litigation against CVL.  (ECF No. 125.)  In support of his petition, the

Receiver contended, among other things, that:  (1) the business and financial

activities of the Receivership Entities were consistent with a Ponzi investment

scheme; (2) at least $643,000 in funds from the Receivership Entities were diverted

by Mr. Iannelli to CVL; (3) Mr. Iannelli had caused Essex to incur a $1.5 million

1  repayment obligation to the seller of the Lumber Yard, which obligation was

2  mirrored by a contemporaneous note from CVL to Essex (the "CVL Note") in the

3  face amount of $1.5 million; and (4) by the time of the Receiver's appointment,

4  Essex had repaid over $450,000 in connection with its obligation to the Lumber

5  Yard's seller, while the CVL Note had come due but not been paid.  (Id.)

6       In other words, the Receiver alleged that approximately $1.1 million in funds

7  were diverted from the Receivership Entities to fund CVL's purchase of the Lumber

8  Yard and to (partially) repay Essex's obligation to the Lumber Yard's seller, and that

9  Essex was still contractually obliged to pay another $1 million to the Lumber Yard's

10 seller, with no concomitant benefit to Essex or the Receivership Entities.  After the

11 Receiver was appointed, Mr. Iannelli assigned to the Receiver the 39.04% interest

12 he held in CVL, which interest the Receiver has confirmed was purchased with

13 funds diverted from the Receivership Entities.[1]  (Winkler Decl. ¶ 3.)

14       The Court granted the Receiver's petition to commence litigation against CVL

15 on July 29, 2020 (ECF No. 177) and, on January 29, 2021, the Receiver filed his

16 original Complaint in the CVL Action, alleging causes of action against CVL for:

17 (1)Avoidance and Recovery of Actually Fraudulent Transfers; (2) Avoidance and

18 Recovery of Constructively Fraudulent Transfers; (3) Breach of Contract [on the

19 CVL Note]); (4) Breach of Contract [on a second note from CVL to Essex, in a

20 significantly smaller amount]; (5) Unjust Enrichment; and (6) Declaratory Relief.

21 (See CVL Action ECF No. 1.)  With the Court's permission, the Receiver

22 subsequently amended his Complaint in the CVL Action, eliminating his claims for

23 fraudulent transfer.  (See CVL Action ECF Nos. 33, 34.)  Thereafter, the parties to

24

---

25 [1]   As noted above, and in some of the Receiver's prior submissions to the Court,
Mr. Iannelli's interest in CVL, which was purchased with funds diverted from the
26 Receivership Entities, was originally in the amount of over 60%.  In
August 2018, CVL issued a capital call that Mr. Iannelli did not answer, and his
27 membership interest was reduced.  While the Receiver alleged a claim in his
Complaint against CVL to restore that interest, he has agreed to accept the
28 percentage held by Mr. Iannelli at the inception of the receivership (39.04%) in
order to secure a reasonable settlement of the litigation addressed herein.

1  the litigation engaged in significant discovery and an ultimately unsuccessful

2  mediation.

3      The Receiver and CVL filed their respective Motions for Summary Judgment

4  on April 11, 2022, which motions remain pending.  (CVL Action ECF Nos. 35-39.)

5  However, settlement discussions between the parties continued.  On July 19, 2022.

6  the Receiver and CVL filed a Joint Notice of Settlement advising the Court of the

7  settlement proposed for approval by way of the instant Motion.  (ECF No. 49.)

8          **D.     The Receiver's Claims Against The Reyner Parties.**

9      On February 4, 2022, acting on information obtained during discovery in the

10  CVL Action, the Receiver commenced the Second Action, alleging various causes

11  of action against the Reyner Parties arising from and in connection with the CVL

12  transaction.  Each of the causes of action alleged in the Second Action arose from

13  the same or a substantially similar transactional nucleus of facts as did the claims

14  alleged by the Receiver the CVL Action.  (See Second Action ECF No. 1.)  As of

15  the date of this Motion, the Reyner Parties have not responded to the Receiver's

16  Complaint, instead filing (with the Receiver) a Joint Notice of Settlement (Second

17  Action ECF No. 18) on July 19, 2022, advising the Court of the settlement presently

18  submitted for approval via the instant Motion.

19          **E.     The Settlement Agreement.**

20      The Receiver has undertaken a diligent review of the record developed in the

21  prosecution of the CVL Action, including materials produced subject to the

22  settlement and mediation privileges.  (Winkler Decl. ¶ 4.)  The information obtained

23  by the Receiver has enabled him to:  (1) confirm certain of the alleged diversions of

24  funds from the Receivership Entities by Mr. Iannelli; (2) estimate the value of the

25  Lumber Yard's business operations and real property as over $6 million; and

26  (3) estimate of the value of the Lumber Yard's real property alone as, at least,

27  $2 million.  (Id.)  As noted above, the Receiver holds a 39.04% interest in the CVL,

28  which owns the Lumber Yard, for the benefit of the Receivership Entities.  In

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

addition, the Receiver has undertaken an extensive review of the fees and expenses incurred to date in connection with litigation the CVL Action and the Second Action, along with the fees and expenses estimated to be incurred should both of these matters continue to be litigated through trial.  (Id.)

CVL and the Reyner Parties vigorously dispute the causes of action alleged by the Receiver in the CVL Action and the Second Action, and have aggressively defended against the Receiver's claims.  Nonetheless, after extensive litigation and discovery in the CVL Action, multiple substantive discussions regarding the claims alleged in the Second Action, and the Receiver's review of the record developed and fees and expenses incurred to date, the Receiver, CVL, and the Reyner Parties have arrived at a settlement intended to resolve both the CVL Action and the Second Action.  (Winkler Decl. ¶ 5, Ex. 1.)  The parties have executed a Settlement Agreement and Mutual Release (the "Settlement Agreement"), the key terms of which include:

- CVL will make payments totaling $1.1 million to the Receiver, resulting in the recovery of nearly 100% of the funds initially identified by the Receiver as having been wrongfully diverted to the CVL transaction;

- The Receiver shall retain the interest he presently holds in CVL for the benefit of the Receivership Entities, which interest shall be protected from dilution via any capital calls or other demands for funding from CVL, and which interest may subsequently be sold by the Receiver (resulting in a recovery of additional funds) or deposited into a liquidating trust;

- CVL will be permitted, upon the election of its manager, to split its business and real estate holdings for the purposes of assigning a 10% interest in CVL's business to its long-time general manager, Jason

1        Minteer, while permitting the Receiver to retain an undiluted 39.04%

2        interest in CVL's valuable real property;

3      •  The Receiver, CVL, and the Reyner Parties will mutually release one

4        another for any and all claims arising from or in connection with the

5        issues underlying the CVL Action and the Second Action (including

6        unknown claims); and

7      •  Upon the first payment to the Receiver contemplated by the Agreement

8        (in the amount of $800,000), the CVL Action and the Second Action

9        shall be submitted for dismissal, with prejudice.

10  (Id., Ex. A.)

11      In the Receiver's reasonable business judgment, the settlement presents an

12  opportunity to realize an excellent recovery for the benefit of the Receivership

13  Entities.  (Id. at ¶ 6.)  This is particularly so given that the settlement memorialized

14  by the Agreement (1) contemplates payments to the Receiver of approximately

15  100% of the funds initially alleged to have been improperly transferred by

16  Mr. Iannelli in connection with the CVL transaction; while (2) permitting the

17  Receiver to retain his interest for prospective sale at a later date, the settlement

18  presents an opportunity to realize an excellent recovery for the benefit of the

19  Receivership Entities.  (Id.)  This is underscored by the fact that, as reflected in the

20  Receiver's recent Interim Reports, the prosecution of the CVL Action has been more

21  complicated, costly, and extensive than initially anticipated.

22      If approved by the Court, the settlement would result in a significant cash

23  recovery for the benefit of the Receivership Entities and enable the Receiver to

24  significantly reduce the attorneys' fees and expenses he is incurring in connection

25  with his service as Receiver, thereby benefitting the receivership estate even further.

26  It would also enable him to retain a valuable interest in CVL for disposition at later

27  date, preserving the opportunity to secure still greater recoveries.  Accordingly, the

28  Receiver believes that the settlement memorialized by the Settlement Agreement

reflects an appropriate compromise, and adequately compensates the Receivership
Entities for their alleged injury.  (<u>Id.</u> at ¶ 7.)  The Receiver therefore respectfully
requests that the Court approve the settlement as memorialized by the Settlement
Agreement and authorize him, CVL, and the Reyner Parties to perform their
respective obligations thereunder.

## III.    <u>ARGUMENT.</u>

A federal receiver's power to compromise claims is subject to court approval.
As noted by the Ninth Circuit Court of Appeals in <u>SEC v. Hardy</u>, <u>803 F.2d 1034,
1037</u> (9th Cir. 1986), "[a] district court's power to supervise an equity receivership
and to determine the appropriate action to be taken in the administration of the
receivership is extremely broad."  With regard to settlements entered into by a
federal receiver, the Court's supervisory role includes reviewing and approving
those settlements in light of a federal policy generally favoring settlements before
trial.  <u>See</u> <u>Fed. R. Civ. P. 16(c)</u>, Advisory Committee Notes.

Courts often look to bankruptcy for guidance in the administration of
receivership estates.  <u>See</u> <u>SEC v. Capital Consultants, LLC</u>, <u>397 F.3d 733, 745</u>
(9th Cir. 2005); <u>SEC v. Am. Capital Inv., Inc.</u>, <u>98 F.3d 1133, 1140</u> (9th Cir. 1996);
<u>SEC v. Basic Energy & Affiliated Res.</u>, <u>273 F.3d 657, 665</u> (6th Cir. 2001); <u>see</u> also
Local Civil Rule 66-8 ("a receiver shall administer the estate as nearly as possible in
accordance with the practice in the administration of estates in bankruptcy").  A
bankruptcy court may approve a compromise of claims asserted by or against the
estate if the compromise is "fair and equitable."  <u>Woodson v. Fireman's Fund
Ins. Co. (In re Woodson)</u>, <u>839 F.2d 610, 620</u> (9th Cir. 1988).  The approval of a
proposed compromise negotiated by a court-appointed fiduciary "is an exercise of
discretion that should not be overturned except in cases of abuse leading to a result
that is neither in the best interest of the estate nor fair and equitable for the
creditors."  <u>In re MGS Mktg.</u>, <u>111 B.R. 264, 266-67</u> (B.A.P. 9th Cir. 1990).

The Court has great latitude in approving compromises.  In passing on the proposed compromise, the Court should consider the following:

      a.   The probability of success in litigation;

      b.   The difficulties, if any, to be encountered in the matter of collection;

      c.   The complexity of the litigation involved and the expense, inconvenience, and delay necessarily attending; and

      d.   The paramount interest of the creditors and a proper deference to their reasonable views in the premises.

In re Woodson, 839 F.2d at 620.

Here, the Receiver has weighed the costs and benefits of litigation and determined, in his reasonable business judgement, that the settlement, as memorialized by the Settlement Agreement, is in the best interests of the Receivership Entities.

As noted above, the Receiver has undertaken a diligent review of the record developed in the prosecution of the CVL Action, including materials produced subject to the settlement and mediation privileges.  While the Receiver has confirmed certain of the alleged diversions of funds from the Receivership Entities by Mr. Iannelli in connection with the CVL transaction, and has developed an estimate of the value of the Lumber Yard, including its associated real property, he has also evaluated the prospective, significant cost associated with continued litigation.

While the Receiver is confident in the claims he has alleged, CVL and the Reyner Parties have defended and are expected to continue to defend against the Receiver's claims vigorously.  Moreover, notwithstanding the Receiver's confidence in his accounting and the viability of his claims, the pendency of the parties' competing Motions for Summary Judgment suggests there are complicated issues to resolve, which may require the time and expense associated with trial.  Because the claims alleged in the Second Action derive from the same nucleus of facts as do those in the CVL Action, it is reasonable to believe that the Second Action will be

1  vigorously defended as well, increasing litigation cost and further delaying a

2  complete resolution of the Receiver's claims.

3       Perhaps most critically, the settlement proposed here *significantly* benefits

4  creditors of the Receivership Entities.  As noted above, the Receiver's initial

5  allegations, based on a detailed accounting of the business and financial activities of

6  the Receivership Entities, included claims that Mr. Iannelli improperly diverted

7  approximately $1.1 million in Receivership Entity funds to CVL (in connection with

8  his purchase of an interest in CVL and CVL's purchase of the Lumber Yard).  This

9  settlement, if performed, would return 100% of that amount to the receivership

10 estate, while enabling the Receiver to retain his interest in the Lumber Yard for later

11 disposition, including via sale.  Put another way, *the settlement will result in a cash*

12 *payment recovery of approximately 100% of the amount initially identified as*

13 *having been wrongfully diverted from Essex*, and *could yield still greater returns* for

14 the benefit of the receivership estate if and when the Receiver sells his interest.

15 Accordingly, the Receiver respectfully submits that the settlement, as memorialized

16 in the Agreement, is in the best interests of the Receivership Entities' creditors.

17 **IV.   CONCLUSION.**

18      Based on the foregoing, the Receiver respectfully requests an order approving

19 the settlement, as memorialized in the Settlement Agreement, and authorizing the

20 Receiver to perform his agreed-upon obligations thereunder.

21

22 Dated:  September 7, 2022          ALLEN MATKINS LECK GAMBLE
                                      MALLORY & NATSIS LLP
23                                    DAVID R. ZARO
                                      JOSHUA A. DEL CASTILLO
24                                    MATTHEW D. PHAM

25                                    By:_____/s/____Joshua A. del Castillo_____
26                                       JOSHUA A. DEL CASTILLO
                                         Attorneys for Receiver
27                                       GEOFF WINKLER

28

DAVID R. ZARO (BAR NO. 124334)
JOSHUA A. DEL CASTILLO (BAR NO. 239015)
MATTHEW D. PHAM (BAR NO. 287704)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
865 South Figueroa Street, Suite 2800
Los Angeles, California 90017-2543
Phone: (213) 622-5555
Fax: (213) 620-8816
E-Mail: dzaro@allenmatkins.com
        jdelcastillo@allenmatkins.com
        mpham@allenmatkins.com

Attorneys for Receiver
GEOFF WINKLER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>       Plaintiff,<br><br>       v.<br><br>RALPH T. IANNELLI and ESSEX CAPITAL CORP.,<br><br>       Defendants. | Case No. 2:18-cv-05008-FMO-AFM<br><br>DECLARATION OF RECEIVER, GEOFF WINKLER, IN SUPPORT OF MOTION FOR ORDER APPROVING AND AUTHORIZING PERFORMANCE OF SETTLEMENT AGREEMENT<br><br>[Notice of Motion and Motion; and [Proposed] Order submitted concurrently herewith]<br><br>Date: October 6, 2022<br>Time: 10:00 a.m.<br>Ctrm: 6D<br>Judge Hon. Fernando M. Olguin |

## DECLARATION OF GEOFF WINKLER

I, Geoff Winkler, declare as follows:

1.      I am the Court-appointed receiver for Essex Capital Corporation ("Essex") and its subsidiaries and affiliates (collectively, with Essex, the "Receivership Entities") in the above-entitled matter.  This declaration is submitted in support of my concurrently filed Notice of Motion and Motion for Order Approving and Authorizing Performance of Settlement Agreement.  I have personal knowledge of the facts stated herein and, if called upon to testify, could and would testify competently thereto.

2.      In the course of my investigation and analysis of the business and financial activities of the Receivership Entities, I concluded that hundreds of thousands of dollars in Receivership Entity funds had been wrongfully diverted by Essex's principal, Ralph Iannelli, Jr. to a transaction pursuant to which Mr. Iannelli obtained an (initially, majority) interest in an entity called 915 Elm Avenue CVL, LLc ("CVL"), and that CVL purchased a lumber yard operation and associated real and personal property (collectively, the "Lumber Yard") located in Carpinteria, California.  I further concluded that, not only had Receivership Entity funds been diverted to a transaction which benefitted only Mr. Iannelli, in his personal capacity, but more than $450,000 in additional Receivership Entity funds had been used to retire a portion of a $1.5 million debt that Mr. Iannelli caused Essex – which did not receive any interest in or benefit from the CVL transaction – to incur.  Finally, I also concluded that this $1.5 million debt was mirrored by a note from CVL and payable to Essex in the face amount of $1.5 million, what had come due by the time of his appointment but which had not been repaid.  As a result, in December 2019, I petitioned this Court for authority to commence litigation against CVL.  In my petition, I contended, among other things, that:  (A) the business and financial activities of the Receivership Entities were consistent with a Ponzi investment scheme; (B) at least $643,000 in funds from the Receivership Entities were diverted

by Mr. Iannelli to CVL; (C) Mr. Iannelli had caused Essex to incur a $1.5 million
repayment obligation to the seller of the Lumber Yard, which obligation was
mirrored by a contemporaneous note from CVL to Essex (the "CVL Note") in the
face amount of $1.5 million; and (D) by the time of the Receiver's appointment,
Essex had repaid over $450,000 in connection with its obligation to the Lumber
Yard's seller, while the CVL Note had come due but not been paid.

3.      In other words, I contended that approximately $1.1 million in funds
were diverted from the Receivership Entities to fund CVL's purchase of the Lumber
Yard and to (partially) repay Essex's obligation to the Lumber Yard's seller, and that
Essex was still contractually obliged to pay another $1 million to the Lumber Yard's
seller, with no concomitant benefit to Essex or the Receivership Entities.  After my
appointment, Mr. Iannelli assigned to the Receiver the 39.04% interest he held in
CVL, which interest I confirmed was purchased with funds diverted from the
Receivership Entities.

4.      After the Court approved my request for authority to commence
litigation against CVL, on or around January 29, 2021, I filed my original Complaitn
in the matter styled <u>Winkler v. 915 Elm Avenue CVL, LLC</u>, Case No. 2:21-cv-
00869-FMO-AFM (the "CVL Action").  Since the commencement of the CVL
Action, I have litigated the matter aggressively, and have completed discovery and
submitted a Motion for Summary Judgment, which remains pending with the Court.
However, I have also continued to engage in prospective settlement discussions with
CVL.  In connection with my settlement efforts, I have undertaken a diligent review
of the record developed in the prosecution of the CVL Action, including materials
produced subject to the settlement and mediation privileges.  The information I have
obtained has enabled me to:  (A) confirm certain of the alleged diversions of funds
from the Receivership Entities by Mr. Iannelli; (B) estimate the value of the Lumber
Yard's business operations and real property as over $6 million; and (C) estimate of
the value of the Lumber Yard's real property alone as, at least, $2 million.  In

addition, I have undertaken an extensive review of the fees and expenses incurred to date in connection with litigation the CVL Action and a second action that arose from the CVL Action, styled <u>Winkler v. Reyner, et al.</u>, Case No. 2:22-cv-0800-FMO-AFM (the "Second Action"), along with the fees and expenses estimated to be incurred should both of these matters continue to be litigated through trial.

5.      The defendants in the CVL Action and the Second Action vigorously dispute the causes of action alleged in those matters, and have aggressively defended against my claims.  Nonetheless, after extensive litigation and discovery in the CVL Action, multiple substantive discussions regarding the claims alleged in the Second Action, and my review of the record developed and fees and expenses incurred to date, CVL, the defendants in the Second Action, and I have arrived at a settlement intended to resolve both the CVL Action and the Second Action. Attached hereto as **<u>Exhibit 1</u>** is a true and correct copy of a fully executed Settlement Agreement and Mutual Release (the "Settlement Agreement") memorializing the terms of the settlement reached regarding the CVL Action and the Second Action.

6.      In my reasonable business judgment, the settlement presents an opportunity to realize an excellent recovery for the benefit of the Receivership Entities.  This is particularly so because the settlement:  (A) contemplates payments to the receivership of approximately 100% of the funds that I initially alleged were improperly transferred by Mr. Iannelli in connection with the CVL transaction; while (B) permitting me, in my capacity as receiver, to retain an interest in CVL for prospective sale at a later date, meaning it preserves the possibility of recovering more for the benefit of the receivership estate, over and above the $1.1 million in total payments called for by the settlement.

\\\

\\\

\\\

7.    Accordingly, and for the reasons detailed in my concurrently filed
Motion, I respectfully request that the Court approve the Settlement Agreement and
authorize the parties' performance as provided for thereunder.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 7, 2022, at Las Vegas, Nevada.

_____
Geoff Winkler

# EXHIBIT 1

Exhibit 1
Page 6

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release (the "**Agreement**"), dated as of June 20, 2022 (the "**Effective Date**"), is made by and between Geoff Winkler (the "**Receiver**"), solely in his capacity as the court-appointed permanent receiver for Essex Capital Corporation ("**Essex**") and its subsidiaries and affiliates (collectively, with Essex, the "**Receivership Entities**"), on the one hand, and 915 Elm Avenue CVL, LLC ("**CVL**"), William S. Reyner, Jr., William S. Reyner III, the William S. Reyner, Jr. Trust, and Reyner Family Partners, L.P. (collectively, but not including CVL, the "**Reyner Parties**"), on the other hand.  The Receiver, CVL, and the Reyner Parties are sometimes collectively referred to herein as the "**Parties**" or individually as a "**Party**."

## RECITALS

A.    On or around June 5, 2018, in the United States District Court for the Central District of California (the "**District Court**" or "**Court**"), the United States Securities and Exchange Commission (the "Commission") commenced the enforcement action styled <u>SEC v. Ralph Iannelli, et al.</u>, Case No. 2:18-cv-05008-FMO-AFM (the "**Enforcement Action**");

B.    The Court appointed the Receiver as the permanent receiver for the Receivership Entities pursuant to its December 21, 2018 Order Regarding Preliminary Injunction and Appointment of a Permanent Receiver (the "**Appointment Order**");

C.    Pursuant to the terms of the Appointment Order, the Receiver was vested with exclusive authority and control over the Receivership Entities and charged, among other things, with (1) marshaling and recovering the assets of the Receivership Entities (collectively, "**Receivership Assets**" and individually, each a "**Receivership Asset**"), wherever and by whomever held; and (2) performing an investigation and accounting of the business and financial activities of the Receivership Entities;

D.    On September 9, 2019, the Court entered its Order Regarding Permanent Injunction (the "**Permanent Injunction**"), pursuant to which, among other things, it affirmed the Receiver's appointment, duties, and powers;

E.    The Appointment Order and Permanent Injunction each authorized the Receiver to prosecute, defend, and settle litigation arising in connection with the Receivership Entities and his efforts to marshal and recover Receivership Assets, or as he deemed necessary to satisfy his duties as receiver;

F.    On December 5, 2019, the Receiver petitioned the Court for authority to commence litigation against CVL.  In support of his petition, the Receiver contended that: (1) the business and financial activities of the Receivership Entities were consistent with a Ponzi investment scheme; (2) at least $643,000 in funds from the Receivership Entities were unlawfully diverted by Essex's principal, Mr. Ralph Iannelli, Jr. ("**Iannelli**")to CVL; and (3) Iannelli had caused Essex to incur a $1.5 million repayment obligation to the seller of a lumber yard operation and its associated real and personal property (collectively, the "**Lumber Yard**") in connection with CVL's purchase of the Lumber Yard, in which, at the time CVL's purchase of the Lumber Yard was completed, Essex received no ownership stake or other interest in CVL; but which (4) was mirrored by a note from CVL to Essex (the "**CVL Note**") in

**Exhibit 1**
**Page 7**

the face amount of $1.5 million, which the Receiver contends is currently in default; along with a second note (the "**Second CVL Note**") in the amount of $125,000 and payable to Essex, which note the Receiver also contends is in default;

G.     The Court granted the Receiver's petition for authority to commence litigation against CVL on July 29, 2020, and, on January 29, 2021, the Receiver filed the action styled Winkler v. 915 Elm Avenue CVL, Case No. 2:21-cv-00869-FMO-AFM (the "**CVL Action**") in the Court, alleging causes of action against CVL for (1) Avoidance and Recovery of Actual Fraudulent Transfers; (2) Avoidance and Recovery of Constructively Fraudulent Transfers; (3) Breach of Contract [on the CVL Note]; (4) Breach of Contract [on the Second CVL Note]; (5) Unjust Enrichment; and (6) Declaratory Relief;

H.     Iannelli had assigned his interest in CVL to the Receiver, in his capacity as receiver, by the time the CVL Action was commenced.  As of the Effective Date, the ownership interests in CVL are as follows;

| William S. Reyner, III | 1.0% |
|---|---|
| Reyner Family Partners, L.P. | 29.64% |
| William S. Reyner, Jr. Trust | 29.64% |
| Geoff Winkler, as Receiver | 39.04% |
| Ralph T. Iannelli, III | 0.68% |

I.     After service of the Receiver's Complaint in the CVL Action, the Receiver and CVL commenced discovery and, as of the date of this Agreement, completed the depositions of the Receiver, Mr. William S. Reyner, Jr., Mr. James Gally, and representatives of CVL's lender, Montecito Bank and Trust, and have undertaken written discovery;

J.     On March 22, 2022, the Receiver filed his First Amended Complaint in the CVL Action, revising his original Complaint and, among other things, removing his causes of action for (1) Avoidance and Recovery of Actual Fraudulent Transfers; and (2) Avoidance and Recovery of Constructively Fraudulent Transfers, which causes of action he is no longer alleging against CVL;

K.     On February 4, 2022, the Receiver commenced a second action relating to the Lumber Yard, styled Winkler v. Reyner, et al., Case No. 2:22-cv-0800-FMO-AFMx (the "**Second Action**"), alleging various causes of action against William S. Reyner, Jr., William S. Reyner III, the William S. Reyner, Jr. Trust, and Reyner Family Partners, L.P.  Each of the causes of action alleged by the Receiver in the Second Action arises from the same or a substantially similar transactional nucleus of facts as do the claims alleged in the CVL Action;

L.     CVL and the Reyner Parties dispute the Receiver's factual allegations and legal theories as presented in the CVL Action and the Second Action, which they believe do not have merit, and have indicated a willingness to defend against those claims vigorously, including via discovery, summary judgment, trial, and appeal.  As to the CVL Note, the Second CVL Note, and a third note which CVL contends Iannelli caused CVL to enter, CVL contends that such notes are not enforceable;

M.      The Receiver, CVL, and the Reyner Parties wish to avoid the expense and
uncertainty associated with further litigation and have agreed to settle and resolve their disputes,
and release all claims,  under the terms and conditions set forth herein.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing recitals and the covenants,
terms, and conditions hereinafter contained, and for other good and valuable consideration, the
receipt and sufficiency of which is hereby acknowledged by each of the Parties, the undersigned
agree as follows:

1.      Court Approval Required.  No later than September 1, 2022, the Receiver shall
perform a site visit (the "**Site Visit**") at the Lumber Yard to meet with Jason Minteer, CVL's
longtime manager, and to confirm that there are no undisclosed, significant issues associated
with CVL that materially diminish the value of the interest held by the Receiver for the benefit of
estate of the Receivership Entities (the "**Estate**").  No more than thirty (30) days after the Site
Visit, the Receiver, CVL, and the Reyner Parties shall apply to the District Court for approval of
this Agreement in the Enforcement Action or the CVL Action, via stipulation, motion, or
application.  The Parties' respective obligations under this Agreement shall be expressly
conditioned upon the entry of an order of the District Court approving this Agreement.  The date
upon which the District Court enters an order approving this Agreement shall be referred to
hereinafter as the "**Settlement Date**."

2.      Payment.  CVL shall pay to the Receiver $1.1 million (the "**Settlement
Amount**") to resolve all claims related to the financing and purchase of CVL that are in dispute.
The Parties agree that the Settlement Amount shall first be treated as repayment of the
$578,683.56, plus applicable interest, which funds were paid by Essex in connection with the
financing and purchase of CVL.  The Receiver shall accept the Settlement Amount as additional
receivership proceeds for the purposes of receivership tax and distribution purposes.  The
Settlement Amount shall be paid, via wire transfer(s), as follows:

2.1.    CVL shall make a payment to the Receiver in the amount of $800,000.00
no later than five (5) business days after the Receiver notifies CVL, in writing, of the entry of an
order from the District Court approving this Agreement;

2.2.    No later than the first anniversary of the Settlement Date, CVL shall make
a payment to the Receiver in the amount of $100,000.00;

2.3.    No later than the second anniversary of the Settlement Date, CVL shall
make a payment to the Receiver in the amount of $100,000.00; and

2.4.    No later than the third anniversary of the Settlement Date, CVL shall
make a payment to the Receiver in the amount of $100,000.00.

2.5.    No later than fifteen (15) days after the date the Parties petition for Court
approval of this Agreement, as provided for in Paragraph 1, above, the Receiver shall provide
wiring instructions and a mailing address to CVL or its authorized representative, in connection
with the payment of the Settlement Amount as provided for in this Paragraph 2, and sub-
Paragraphs 2.1 through 2.4, above.

**Exhibit 1**
**Page 9**

3.      Retention of Interest in CVL.  The Receiver shall retain his ownership interest in CVL, as described in Recital H, above, in the amount of 39.04% for the benefit of the Estate, which interest is hereby acknowledged and affirmed by CVL and the Reyner Parties.  Except as otherwise provided in this Agreement or agreed to in writing by the Receiver, neither CVL nor any of its members, or its manager, including but not limited to any of the Reyner Parties, shall make any capital calls or other demands for funding upon the Receiver or the Estate, including but not limited to funding any portion of any payment of the Settlement Amount, or which has the effect of reducing or diluting the Receiver's or the Estate's ownership interest in CVL, for the duration of the pendency of the Receiver's or the Estate's retention of an interest in CVL. Notwithstanding the restrictions on capital calls or funding demands upon the Receiver and Estate contained in this Paragraph 3, nothing herein shall restrict any member in CVL from making loans to CVL in accordance with Section 3.5 of CVL's operating agreement, which shall remain in effect.  So long as the Receiver or the Estate maintain an interest in CVL, such interest shall include no management rights in CVL.

3.1.      To effectuate the Receiver's retention of his interest in CVL, CVL's current Operating Agreement (appended hereto as **Exhibit A**) shall be amended pursuant to the terms identified in the term sheet appended hereto as **Exhibit B**.  **Exhibits A** and **B** are incorporated by reference into this Agreement, and the Parties accept and agree to the terms thereof.

4.      Outstanding Iannelli Interest in CVL.  Within fifteen (15) days after the Settlement Date, and if he has not already done so, the Receiver shall issue a demand, pursuant to the turn-over provisions of the Appointment Order and Permanent Injunction applicable to Receivership Assets, to Ralph Iannelli III, who currently holds a 0.68% interest in CVL, requesting that he immediately turn over his interest in CVL to the Receiver on the basis that such interest was acquired with Receivership Assets.  Should Ralph Iannelli III fail to turn over such interest within twenty-one (21) days of the Receiver's written demand, the Receiver will file an application in the District Court for turnover of the interest.  In the event that the Receiver recovers the interest in CVL held by Ralph Iannelli III, such interest shall be split among the remaining members of CVL, *pro rata*, based on their membership interests as stated in Recital I, above, such that, after such turnover, the total ownership interests in CVL will be as follows:

| | |
|---|---|
| William S. Reyner, III | 1.01% |
| Reyner Family Partners, L.P. | 29.84% |
| William S. Reyner, Jr. Trust | 29.84% |
| Geoff Winkler, as Receiver | 39.31% |

5.      Split of CVL Business and Real Estate Holdings.  William S. Reyner, Jr., in his capacity as Manager of CVL, has advised the Receiver that CVL has determined that it is appropriate to grant the long-time general manager of the Lumber Yard, Jason Minteer, a 10% membership interest in CVL's Lumber Yard business (the "**CVL Business**"), but not its associated real property (the "**Minteer Transaction**").  In order to ensure that Mr. Minteer receives only a 10% interest in the Lumber Yard business and not CVL's real property, the

**Exhibit 1**
**Page 10**

members of CVL intend to create a California limited liability company (the "**New LLC**") which shall hold CVL's real property assets, including but not limited to the real property located at 915 Elm Avenue, Carpinteria, California 93013 (collectively, the "**Real Property**").  At inception, the members of the New LLC and their corresponding membership interests shall be:[1]

| William S. Reyner, III | 1.0% |
| Reyner Family Partners, L.P. | 29.64% |
| William S. Reyner, Jr. Trust | 29.64% |
| Geoff Winkler, as Receiver | 39.04% |
| Ralph T. Iannelli, III | 0.68% |

5.1.    The members of the New LLC shall promptly agree upon an Operating Agreement for the New LLC, which shall be in a form substantially similar to CVL's current Operating Agreement, as amended in accordance with paragraph 3.1 above, and as provided for in this Agreement and in **Exhibit B** hereto.

5.2.    Once the New LLC is created, ownership of the Real Property shall be promptly transferred to the New LLC.  Thereafter, CVL will own only the CVL Business.  CVL will continue to fund all costs associated with the CVL Business and ownership of the Real Property, including but not limited to loan payments, taxes, operating expenses, improvements, utilities, and maintenance, either directly or through lease payments.  CVL and New LLC will enter a triple net lease (the "**Lease**"), to be negotiated in good faith by and between CVL and the New LLC.  The Lease shall have a term of five (5) years, but may be renewed or extended in two (2) year increments, upon the written agreement of CVL and the New LLC.

5.3.    Once ownership of the Real Property has been transferred to the New LLC, CVL will then issue additional membership interests in CVL sufficient to grant Mr. Minteer a 10% interest in CVL, provided that Mr. Minteer executes a non-interest bearing promissory note for a nominal amount.  If consummated, the Minteer Transaction would have the effect of diluting, *pro rata*, the membership interests in CVL of its current members, but it shall in no way dilute or reduce the Receiver's interest in the Real Property, which shall remain at no less than 39.04%.

5.4.    As provided for herein, this Court shall retain jurisdiction over the terms of this Agreement.  Should any disputes arise between the Parties relating to the Minteer Transaction (including the drafting and contents of the Operating Agreement for the New LLC), which disputes the Parties are unable to resolve through good faith efforts within thirty (30) days of the commencement of any such dispute, any Party may petition the Court for an order requiring the Parties to attend a mediation before Magistrate Judge Alexander F. MacKinnon of

---

[1] If the Receiver recovers the interests in CVL described in Paragraph 4, above, before New LLC is created, the membership interests of New LLC at inception shall be William S. Reyner, III 1.01%; Reyner Family Partners, L.P. 29.84%; William S. Reyner, Jr. Trust 29.84%; and Geoff Winkler, as Receiver 39.31%.

the District Court, or such other magistrate judge of the District Court then assigned to the Enforcement Action (the "**Magistrate**").  The Parties further agree that the Magistrate shall have jurisdiction and authority to resolve any and all disputes arising from or in connection with the Minteer Transaction (including the drafting and contents of the Operating Agreement for the New LLC) in the event that the Parties fail to reach a resolution through mediation, as provided for herein.

       5.5.    Nothing in this Paragraph 5, above, or sub-Paragraphs 5.1 through 5.5 shall be deemed to require CVL to proceed with the Minteer Transaction.  In the event that CVL elects to proceed with the Minteer Transaction, the Receiver shall extend his reasonable cooperation in connection therewith.

      6.    <u>Application of Asset Freeze and Self-Help and Litigation Bars</u>.  Given the Estate's continuing interest in CVL, the Lumber Yard, the CVL Business, and the Real Property, as each of the foregoing capitalized terms is defined in this Agreement, CVL, the Lumber Yard, the CVL Business, and the Real Property, as each of the foregoing capitalized terms is defined in this Agreement, shall remain within the ambit of the prohibition on litigation and self-help imposed pursuant to Section XIV of the Appointment Order.  The Parties jointly commit to opposing, and using reasonable efforts to oppose, any attempts by third parties, including putative creditors of CVL, to avoid, or obtain relief from, the prohibitions on litigation and self-help imposed pursuant to Section XIV of the Appointment Order that arise from or in connection with CVL, the Lumber Yard, the CVL Business, and the Real Property, as each of the foregoing capitalized terms is defined in this Agreement.  The Receiver further agrees to provide reasonable, non-monetary assistance to CVL in connection with CVL's defense of any creditor actions that are allowed to proceed to litigation notwithstanding the prohibitions on litigation and self-help imposed pursuant to Section XIV of the Appointment Order.  Moreover, and provided this Agreement is approved by the Court, the asset freeze imposed pursuant to Section VI of the Appointment Order shall not prevent CVL from taking any actions reasonably required to effectuate the terms of purpose of this Agreement, including transferring ownership of the Real Property to the New LLC.

      7.    <u>Resumption of Distributions to CVL Members</u>.  CVL anticipates resuming distributions to its members in profitable years, consistent with their respective membership interests and the terms of its Operating Agreement, provided that such distributions are not then prohibited by any agreement between CVL and its lender(s).

      8.    <u>Dismissal of the CVL Action</u>.  No later than ten (10) business days after the Settlement Date, and provided that the first payment of the Settlement Amount has been made in accordance with the terms of Paragraph 2, above, the Parties shall file a Joint Stipulation in the District Court providing for the dismissal of the CVL Action, with prejudice.

      9.    <u>Dismissal of the Second Action</u>.  No later than ten (10) business days after the Settlement Date, and provided that the first payment of the Settlement Amount has been made in accordance with the terms of Paragraph 2, above, the Parties shall file a Joint Stipulation in the District Court providing for the dismissal of the Second Action, with prejudice.

      10.    <u>Release by Receiver.</u>  With the exception of the Parties' obligations under this Agreement, the claims alleged by the Receiver against all defendants in the action styled <u>Winkler</u>

v. Reyner, et al., USDC, C.D. Cal. Case No. 2:21-CV-05730-FMO-AFM (the "**Disgorgement Action**") and the defendants in the Disgorgement Action (collectively, the "**Disgorgement Defendants**"), to which none of the releases in this Agreement shall apply, and on the condition that the first payment of the Settlement Amount due under Paragraph 2, above, has been timely paid, and upon the Receiver's receipt of such payment, the Receiver, on his behalf and on behalf of the Receivership Entities, and his and the Receivership Entities' agents, attorneys, employees, partners, directors, officers, successors and assigns, forever, irrevocably and unconditionally releases and discharges CVL and the Reyner Parties, and their respective agents, attorneys, employees, partners, directors, officers, successors and assigns, of and from any and all claims, demands, debts, obligations, liabilities, costs, expenses, rights of action, causes of action, awards and judgments arising from or in connection with CVL's purchase and operation of the Lumber Yard, and any claims that were or could have been raised in the CVL Action or the Second Action (collectively, the "**Receiver Released Claims**").  For avoidance of doubt, it is the intent of the Parties that this release shall apply to all claims, including those related to the CVL Action and the Second Action, except the Receiver's claims in the Disgorgement Action, which shall not be waived, released, or otherwise modified by this Agreement.

11.    <u>Release by CVL and the Reyner Parties</u>.  With the exception of any defenses presented by any Disgorgement Defendant to the claims alleged by the Receiver in the Disgorgement Action, and upon the first payment of the Settlement Amount due under Paragraph 2, above, CVL and the Reyner Parties, on their own behalf and on behalf of their respective agents, attorneys, employees, partners, directors, officers, successors and assigns, forever, irrevocably and unconditionally release and discharge the Receiver, the Receivership Entities, and the Estate, and their respective agents, attorneys, employees, partners, directors, officers, successors and assigns, of and from any and all claims, demands, debts, obligations, liabilities, costs, expenses, rights of action, causes of action, awards and judgments arising from or in connection with CVL's purchase and operation of the Lumber Yard, and any claims that were or could have been raised in the CVL Action or the Second Action (collectively, the "**CVL/Reyner Released Claims**").  For avoidance of doubt, it is the intent of the Parties that the Disgorgement Defendants' defenses to the Receiver's claims in the Disgorgement Action shall not be waived, released, or otherwise modified by this Agreement.

12.    <u>California Civil Code Section 1542 Waiver</u>.  The Receiver, CVL, and the Reyner Parties, individually and collectively, acknowledge and agree that the Receiver Released Claims and the CVL/Reyner Released Claims include claims of every nature and kind whatsoever, whether known or unknown, suspected or unsuspected, and further acknowledge that they may be presently unknown or unsuspected, and may be based upon hereafter discovered facts different from, or in addition to, those which they now know, or believe to be true.  Nevertheless, the Parties agree that the foregoing release shall be and remain effective in all respects, notwithstanding such different or additional facts, or the discovery thereof, and further hereby expressly waive and relinquish any and all rights provided in <u>California Civil Code Section 1542</u> which provides as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY

AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

The Receiver, CVL, and the Reyner Parties expressly waive and release any rights and benefits that they have or may have under any similar law or rule of any other jurisdiction pertaining to the matters released herein. It is the intention of the Parties through this Agreement and with the advice of counsel to fully, finally, and forever settle and release the claims and disputes existing between them as provided herein, known and unknown. The releases herein given shall be and remain in effect as full and complete releases of all such matters notwithstanding the discovery of any additional claims or facts relating thereto.

13. <u>Voluntary Signing</u>. Each of the Parties has executed this Agreement without any duress or undue influence.

14. <u>Independent Counsel</u>. Each of the Parties acknowledges and agrees that he/she/it has had an opportunity to consult with independent counsel of his/her/its own choice throughout all negotiations which preceded the execution of this Agreement, that he/she/it has executed and approved of this Agreement after an opportunity to consult with said counsel, and that he/she/it shall not deny the validity of this Agreement on the ground that such Party did not have the advice of legal counsel.

15. <u>Governing Law and Venue</u>. This Agreement shall in all respects be interpreted, enforced, and governed by and under the laws of California, and subject to the exclusive jurisdiction of the Court, which shall retain jurisdiction for all purposes, including but not limited to the enforcement of this Agreement.

16. <u>Construction and Interpretation</u>. The headings in this Agreement are inserted for convenience only and will not be deemed a part of the Agreement for construction or interpretation purposes. The Parties expressly declare that they each participated in the negotiation of this Agreement, and that therefore no ambiguities in this Agreement may be resolved in favor of one Party because the other Party was the drafter. No Party is the designated drafter of this Agreement.

17. <u>No Assignment</u>. The Parties represent that they have not assigned, transferred, or purported to assign or transfer to any person or entity any claims, demands, liabilities, damages, actions or causes, suits and/or controversies of any kind and every nature that are released herein, and no other person or entity has any interest in any claims, demands, liabilities, damages, actions or causes, suits and/or controversies of any kind and every nature that are released herein, provided that the Receiver shall not be barred from assigning his or the Estate's rights under this Agreement after the Settlement Date.

18. <u>No Admission of Liability</u>. The Agreement does not constitute, nor shall it be construed as, an admission or concession by any of the Parties for any purpose. By executing this Agreement, none of the Parties admits wrongdoing, liability, or fault in connection with, or to the merit of, the Enforcement Action, the CVL Action, the Second Action, or the allegations asserted therein.

19. <u>Waiver/Amendment</u>. No breach of any provision of this Agreement can be waived unless in writing. Waiver of any one breach of any provision of this Agreement is not a waiver of any other breach of the same or of any other provision of this Agreement. Amendment of this Agreement may be made only by written agreement signed by the Parties.

20.    <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.  Additionally, signature pages delivered via facsimile or electronic mail in portable document format (.pdf) shall be deemed original.

21.    <u>Acts in Furtherance of Purpose of Agreement</u>.  Each of the Parties shall execute all documents and do all acts reasonably necessary to carry out the purpose of this Agreement.

22.    <u>Time of the Essence</u>.  The Parties agree and acknowledge that time is of the essence with respect to all terms, conditions, and obligations of this Agreement.

23.    <u>Attorneys' Fees and Costs</u>.  The Parties shall each bear their own costs and attorneys' fees incurred in connection with the CVL Action, the Second Action, the negotiation and documentation of this Agreement, and the Parties' efforts to obtain District Court approval thereof.  If any proceeding, action, suit, or claim is undertaken to interpret or enforce this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs incurred in connection with such dispute.

24.    <u>Notices</u>.  Notices to be provided hereunder shall be effective if sent to the following via U.S. Mail and electronic mail:

**To CVL:**
William S. Reyner, Jr.
2895 Hidden Valley Lane
Santa Barbara, CA 93108
wsreyner@gmail.com

With a copy to:
David L. Cousineau, Esq.
Cappello & Noël, LLP
831 State St.
Santa Barbara, CA 93101-3227
dcousineau@cappellonoel.com

**To the Reyner Parties:**
William S. Reyner, Jr.
Susan Reyner
2895 Hidden Valley Lane
Santa Barbara, CA 93108
wsreyner@gmail.com
susanreyner@gmail.com

With a copy to:
David L. Cousineau, Esq.
Cappello & Noël, LLP
831 State St.
Santa Barbara, CA 93101-3227
dcousineau@cappellonoel.com

**Exhibit 1**
**Page 15**

**To the Receiver:**
Geoff Winkler
American Fiduciary Services, LLC
715 NW Hot Street #4364
Portland, OR 97208

With a copy to:
Joshua A. del Castillo, Esq.
Allen Matkins Leck Gamble Mallory & Natsis LLP
865 S. Figueroa Street, Suite 2800
Los Angeles, CA 90017-2543

      IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the date first above written.

Exhibit 1
Page 16

915 ELM AVENUE CVL, LLC

By: _____
     WILLIAM S. REYNER, JR., Manager


WILLIAM S. REYNER, JR.

By: _____


WILLIAM S. REYNER, JR. TRUST

By _____
William S. Reyner, Jr., Trustee


REYNER FAMILY PARTNERS, L.P.

By _____
Susan Reyner, General Partner


WILLIAM S. REYNER, III

By_____


GEOFF WINKLER, solely in his capacity as Court-
appointed permanent Receiver for Essex Capital
Corporation and its subsidiaries and affiliates

By: _____
     GEOFF WINKLER, court-appointed Receiver


**Exhibit 1**
**Page 17**

915 ELM AVENUE CVL, LLC

By: _____
      WILLIAM S. REYNER, JR., Manager


WILLIAM S. REYNER, JR.


By: _____


WILLIAM S. REYNER, JR. TRUST


By_____
William S. Reyner, Jr., Trustee


REYNER FAMILY PARTNERS, L.P.


By_____
Susan Reyner, General Partner


WILLIAM S. REYNER, III



By

GEOFF WINKLER, solely in his capacity as Court-
appointed permanent Receiver for Essex Capital
Corporation and its subsidiaries and affiliates


By: _____
      GEOFF WINKLER, court-appointed Receiver

915 ELM AVENUE CVL, LLC

By: _____
    WILLIAM S. REYNER, JR., Manager


WILLIAM S. REYNER, JR.


By: _____


WILLIAM S. REYNER, JR. TRUST


By_____
William S. Reyner, Jr., Trustee


REYNER FAMILY PARTNERS, L.P.


By_____
Susan Reyner, General Partner

WILLIAM S. REYNER, III


By_____


GEOFF WINKLER, solely in his capacity as Court-
appointed permanent Receiver for Essex Capital
Corporation and its subsidiaries and affiliates


By: _____
    GEOFF WINKLER, court-appointed Receiver

# EXHIBIT A

## CVL Operating Agreement

# OPERATING AGREEMENT

## OF

## 915 ELM AVENUE CVL, LLC,

### a California limited liability company

THE MEMBERSHIP INTERESTS REFERRED TO IN THIS AGREEMENT HAVE NOT
BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER
THE SECURITIES OR "BLUE SKY" LAWS OF ANY STATE OR OTHER JURISDICTION,
AND MAY NOT BE SOLD OR TRANSFERRED UNLESS THEY ARE REGISTERED
UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND ANY OTHER
APPLICABLE SECURITIES OR "BLUE SKY" LAWS, OR UNLESS AN EXEMPTION FROM
SUCH REGISTRATION IS AVAILABLE.   SUCH MEMBERSHIP INTERESTS ARE
SUBJECT TO THE RESTRICTIONS ON TRANSFER SET FORTH IN THIS AGREEMENT.

**Exhibit 1**
**Page 21**

RECEIVER_CVL001290

# OPERATING AGREEMENT
## OF
## 915 ELM AVENUE CVL, LLC,
### a California limited liability company

**THIS OPERATING AGREEMENT** (this "**Agreement**"), dated effective November 23, 2015 (the "**Effective Date**"), is entered into by and among the parties set forth on <u>Exhibit A</u>, with reference to the following facts:

## RECITALS:

**A.**    915 Elm Avenue CVL, LLC, a California limited liability company (the "**Company**"), filed Articles of Organization with the California Secretary of State on November 23, 2015 (the "**Articles**").

**B.**    The members of the Company desire to adopt and approve an operating agreement for the Company on the terms and conditions set forth in this Agreement.

## AGREEMENTS:

NOW, **THEREFORE**, the parties agree as follows:

1.    **DEFINITIONS**

When used in this Agreement, the following terms shall have the meanings set forth below (all capitalized terms used in this Agreement that are not defined in this <u>Section 1</u> shall have the meanings set forth elsewhere in this Agreement):

1.1    "**Act**" means the California Revised Uniform Limited Liability Company Act, codified in Corporations Code Section 17701.01 et <u>seq.</u>

1.2    "**Agreement**" means this Operating Agreement of the Company, as amended from time to time.

1.3    "**Bankruptcy**" means (a) the filing of an application by a Member for, or his or her consent to, the appointment of a trustee, receiver, or custodian of his or her other assets; (b) the entry of an order for relief with respect to a Member in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time; (c) the making by a Member of a general assignment for the benefit of creditors; (d) the entry of an order, judgment, or decree by any court of competent jurisdiction appointing a trustee, receiver, or custodian of the assets of a Member unless the proceedings and the person appointed in proceedings are dismissed within ninety (90) days; or (e) the failure by a Member generally to pay his or her debts as the debts become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code, as determined by the Bankruptcy Court, or the admission in writing of his or her inability to pay his or her debts as they become due.

**Exhibit 1**
**Page 22**

RECEIVER_CVL001291

**1.4** "**Book Value**" shall mean, as of any particular date, the value at which the Company's assets are properly reflected on the books of the Company as of such date in accordance with the provisions of Regulations Section 1.704-1(b). The Book Values of all Company assets shall, if the Managers in their sole discretion deems it appropriate, be adjusted to equal their respective gross fair market values at the times specified in the Regulations.

**1.5** "**Capital Account**" means, with respect to any Member, the capital account that the Company establishes and maintains for such Member pursuant to <u>Section 3.3</u> .

**1.6** "**Capital Contribution**" means the total value of cash and fair market value of property (including promissory notes or other obligations to contribute cash or property) contributed to the Company by a Member.

**1.7** "**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

**1.8** "**Company Minimum Gain**" has the meaning ascribed to the term "partnership minimum gain" in Regulations Section 1.704-2(d).

**1.9** "**Distributable Cash**" means the amount of cash from the Company's operations and business activities available for distribution to the Members, taking into account all Company debts, liabilities, projected operational needs, and obligations of the Company then due or anticipated and amounts that the Managers deem necessary to place into reserves for customary and usual claims and reserves with respect to the Company's business.

**1.10** "**Economic Interest**" means a Member's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but does not include any other rights of a Member, including, without limitation, the right to vote or participate in the Company's management, or, except as required by the applicable law, any right to information concerning the Company's business and affairs.

**1.11** "**Fiscal Year**" means the Company's fiscal year, which shall be the calendar year.

**1.12** "**Initial Manager Termination Event**" means as to any Initial Manager (a) the death, incompetency, or permanent disability of such Manager; or (b) fraudulent, grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law by such Manager relating to his provision of services to the Company under this Agreement.

**1.13** "**Initial Managers**" means the individuals designated in Section 5.1.

**1.14** "**Laws**" means the various acts applicable to securities passed by California, as amended, and any other applicable blue sky laws.

**1.15** "**Majority of the Members**" the Members holding, in the aggregate, a majority (i.e., greater than fifty-percent (50%)) of the total Membership Interests held by all Members entitled to vote on, or provide their approval or consent to, a matter.

**1.16** "**Manager**" means an individual elected as a Manager of the Company in accordance with <u>Section 5</u>.

2

RECEIVER_CVL001292

**1.17**    "**Member**" means each Person who (a) is listed as a member of the Company on the attached Exhibit A, or (b) becomes a member of the Company in accordance with this Agreement.

**1.18**    "**Member Nonrecourse Debt**" has the meaning ascribed to the term "partner nonrecourse debt" in Regulations Section 1.704-2(b)(4).

**1.19**    "**Member Nonrecourse Deductions**" means items of Company loss, deduction, or Tax Code Section 705(a)(2)(B) expenditures that are attributable to Member Nonrecourse Debt.

**1.20**    "**Membership Interest**" means a Member's entire interest in the Company, including the Member's Economic Interest, the right to receive information concerning the Company's business and affairs, and the right to vote on or participate in the Company's management.

**1.21**    "**Net Profit**" and "**Net Loss**" means the Company's income, gain, loss, deductions, and credits in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles employed under the method of accounting at the close of each Fiscal Year on the Company's information tax return filed for federal income tax purposes.

**1.22**    "**Nonrecourse Liabilities**" has the meaning ascribed to it in Regulations Section 1.752-1(a)(2).

**1.23**    "**Percentage Interest**" means a Member's undivided percentage economic interest in the Company set forth on Exhibit A, as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.

**1.24**    "**Person**" means an individual, general partnership, limited partnership, limited liability company, corporation, trust, estate, real estate investment trust, or any other entity.

**1.25**    "**Prime Rate**" means the prime or reference rate of interest announced as such from time to time by the Wall Street Journal.

**1.26**    "**Regulations**" means, unless the context clearly indicates otherwise, the regulations currently in force as final or temporary that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

**1.27**    "**Securities Act**" means the Securities Act of 1933, as amended.

**1.28**    "**Tax Distributions**" shall mean an amount equal to (a) the combined effective maximum marginal federal and California individual income tax rates in effect for such fiscal year (taking into account the deductibility of state taxes against federal taxable income), multiplied by (b) the amount by which the Net Profit allocated to such Member for such fiscal year exceeds the cumulative Net Loss (if any) allocated to such Member since the inception of the Company. Cumulative Net Loss means all Net Loss allocated to such Member in prior years, net of all Net Profits allocated to such Member for such years, and shall not be less than zero.

3

**1.29** **"Tax Matters Member"** means Ralph T. Iannelli, or his successor as designated pursuant to <u>Section 8.3</u>.

**1.30** **"Transfer"** means:

(a)    any sale, conveyance, pledge, encumbrance, disposition or other transfer, whether voluntary or involuntary, by operation of law or otherwise, including, without limitation, any disposition occurring by virtue of the Bankruptcy of a Member, the appointment of a receiver, trustee, conservator or guardian for a Member or a Member's property, a transfer pursuant to the will of a Member or the laws of descent and distribution, a transfer pursuant to court order in the event of divorce, marital dissolution, legal separation or similar proceedings, or a transfer pursuant to any loan or security agreement;  and

(b)    with respect to any Member that is a corporation, limited liability company, partnership, or other entity, "Transfer" shall include a change in ownership effected voluntarily, involuntarily, or by operation of law of twenty-five percent (25%) or more of the ownership interests in such Member.

## 2.    ORGANIZATIONAL MATTERS

**2.1**    **Formation**.  The Members have formed a California limited liability company by filing the Articles with the California Secretary of State.  The Members' rights and liabilities shall be determined pursuant to the Act and this Agreement.  To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

**2.2**    **Name**.  The Company's name shall be **915 ELM AVENUE CVL, LLC**.  The Company's business may be conducted under that name or, upon compliance with applicable laws, any other name that the Managers deem appropriate or advisable.  The Managers shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Managers consider to be appropriate or advisable.

**2.3**    **Term**.  The Company's existence shall continue until terminated in accordance with the terms of this Agreement.

**2.4**    **Office and Agent**.  The Company shall continuously maintain an office and registered agent in the State of California as required by the Act.  The Company's principal office shall be located at 1486 East Valley Rd., 2nd Floor, Santa Barbara, California, 93108.  The Company also may have such offices, anywhere within and without the State of California, as the Managers from time to time may determine, or the Company's business may require.

**2.5**    **Purpose of Company**.  The purpose of the Company is to engage in any lawful activity for which a limited liability company may be organized under the Act.

## 3.    CAPITAL STRUCTURE

**3.1**    **Initial Capital Contributions**.  Each Member's Capital Contribution as of the Effective Date is set forth in the books and records of the Company.

4

RECEIVER_CVL001294

**3.2    No Further Contributions**.  No Member shall be required to make any additional capital contributions. If the Managers determine in good faith that (a) either the Company (i) has insufficient cash funds available to pay the Company's debts or obligations when and as they become due, or (ii) the Company requires additional capital for the Company, and funds are not reasonably available for such purposes from other sources, then the Manager may propose a call for additional contributions to the Company's capital on such terms and conditions as are determined by the Managers.

**3.3    Capital Accounts**.

**3.3.1**    A separate Capital Account shall be maintained for each Member strictly in accordance with the rules set forth in Regulations  Section 1.704-1(b)(2)(iv).  Subject to the preceding sentence, each Member's Capital Account shall be (i) increased by the amount of Capital Contributions made by such Member to the Company and allocations to such Member of Net Profits and other items of book income and gain; and (ii) decreased by the amount of money and fair market value of property (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code) distributed to such Member by the Company and allocations to such Member of Net Losses and other items of book loss and deductions; and (iii) otherwise adjusted in accordance with the additional rules set forth in Regulations  Section 1.704-1(b)(2)(iv).

**3.3.2**    In the event the Book Values of Company assets are adjusted pursuant to Regulations Section 1.704-1(b) and Section 1.5, the Capital Accounts of all Members shall be adjusted simultaneously to reflect the allocations of income, gain, loss or deduction that would be made to the Members if there were a taxable disposition of the Company's property for its fair market value.  If any assets of the Company are to be distributed in kind, such assets shall be distributed on the basis of their fair market values after the Members' Capital Accounts have been adjusted to reflect the manner in which any unrealized income gain, loss or deduction with respect to such assets (that have not been reflected in the Capital Accounts previously) would be allocated between the Members if there were a taxable disposition of the property for its fair market value.

**3.3.3**    If any interest in the Company is transferred in accordance with the provisions of this Agreement, the transferee Member shall succeed to that portion of the Capital Account of the transferring Member as relates to such transferred interest.

**3.3.4**    It is the intent of the Company that the Capital Accounts of all Members be determined and maintained in accordance with the principles of Regulations  Section 1.704-1(b) at all times throughout the full term of the Company, and the foregoing provisions of this Section 3.3 shall be interpreted in accordance with such intention.

**3.4    Return of Capital; Partition**.  Except as otherwise provided herein, no Member shall have any right to (a) demand the return of all or any part of such Member's Capital Account during the term of the Company, or (b) receive a return of such Member's Capital Account from any specific assets of the Company.  Each Member irrevocably waives any right that such Member may have to cause a partition of all or any part of the Company's assets.  No Member shall be entitled to receive any interest with respect to a Capital Contribution.

5

RECEIVER_CVL001295

**3.5**    <u>**Loans to the Company**</u>.  No Member will be required to lend funds to the Company.  However, upon approval of the Managers, a Member may make such loans.  Any such loan will not be considered a Capital Contribution but will be a debt due from the Company to the lending Member, and will be made upon such terms and conditions and bearing interest at such rates as approved by the Managers.

**4.**    <u>**MEMBERS**</u>

**4.1**    <u>**Limited Liability**</u>.  Except as required under the Act or as expressly contemplated in this Agreement, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

**4.2**    <u>**Admission of Additional Members**</u>.    The Managers may admit additional Members to the Company, and issue a Membership Interest to such additional Members to raise necessary capital, from time to time, in its sole discretion, subject to the following:

**4.2.1**    The admission of the additional Members is approved by a Majority of the Members.

**4.2.2**    Each additional Member shall make a Capital Contribution in such amount and on such terms as the Managers reasonably determine to be appropriate based upon the needs of the Company, the net value of the Company's assets, the Company's financial condition, and the benefits anticipated to be realized by the additional Member; and

**4.2.3**    Each additional Member agrees in writing to be bound by the terms of this Agreement.

**4.3**    <u>**Withdrawals or Resignations**</u>.  No Member may withdraw or resign as a Member.

**4.4**    <u>**Certificates of Membership Interest**</u>.  Membership Interests may be represented by certificates.  Each certificate, if any, shall be in such form as may be determined by the Managers.

**4.5**    <u>**Replacement of Lost, Stolen, or Destroyed Certificates**</u>.  Any Member claiming that his, her, or its Membership Interest certificate is lost, stolen, or destroyed may make an affidavit or affirmation of that fact and request a new certificate.  Upon the giving of a satisfactory indemnity to the Company as may be required by the Managers, a new certificate may be issued of the same tenor and representing the same Membership Interest as were represented by the certificate alleged to be lost, stolen, or destroyed.

**4.6**    <u>**Voting Rights**</u>.  Except as otherwise expressly required by this Agreement or the Act, Members shall have no voting, approval, or consent rights with respect to specific matters, except for the right of the Members to approve the following transactions:

**4.6.1**    The admission of additional members under <u>Section 4.2</u>.

**4.6.2**    The removal or appointment of Managers under <u>Section 5.2</u>.

6

RECEIVER_CVL001296

**4.6.3**   Any agreement of merger involving the Company or the sale of all or substantially all of the Company's assets;

**4.6.4**   The dissolution or winding up of the Company in accordance with Section 9; or

**4.6.5**   Any amendment of this Agreement or the Articles.

**4.6.6**   Appointment of a successor Tax Matters Member.

**4.6.7**   Substantial change in the fundamental business conduct by the Company.

**4.6.8**   Any other matter that expressly calls for the vote of the Members under this Agreement.

**4.7**   **Action by Members**.  Except as otherwise expressly set forth herein, where the vote, approval, or consent of the Members is called for under this Agreement, or required by the Act, the vote, approval, or consent of a Majority of the Members shall be required.  Any such vote, approval or consent may be taken or provided (a) at a meeting of the Members (held in person or by telephonic conference call), or (b) by written consent.

**4.8**   **No Managerial Authority**.  The Members shall have no power to participate in the Company's management except as expressly authorized by this Agreement or the Articles and except as expressly required by the Act.  Unless expressly and duly authorized in advance in writing to do so by the Managers, no Member, in his, her, or its capacity as such, shall have any power or authority to bind or act on the Company's behalf in any way, to pledge its credit, or to render it liable for any purpose.

**5.**   **MANAGEMENT AND CONTROL OF THE COMPANY**

**5.1**   **Managers**.  The Company's business, property and affairs shall be managed exclusively by the managers of the Company (the "**Managers**").  The initial Managers of the Company shall be Ralph T. Iannelli and William S. Reyner, Jr. (the "**Initial Managers**").

**5.2**   **Resignation**.  Any Manager may resign at any time by giving written notice to the Company.  The resignation of any Manager shall take effect upon the receipt of that notice or such later time as shall be specified in the notice; and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.  The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

**5.3**   **Removal; Vacancy**.  An Initial Manager may be removed only upon the occurrence of an Initial Manager Termination Event.  In the event of an Initial Manager Termination Event, or the resignation of an Initial Manager, the remaining Initial Manager shall appoint a successor Manager; and such remaining Initial Manager shall have the right, in such individual's sole discretion, to remove and replace such successor Manager until such time as such remaining Initial Manager ceases to serve as a Manager.  Once the last remaining Initial Manager

7

RECEIVER_CVL001297

ceases to serve as a Manager, the Majority of the Members may appoint Managers, remove Managers and fill any managerial vacancy.

**5.4     Exclusive Management by the Managers; Voting.** The Company's business, property, and affairs shall be managed exclusively by the Managers.  Except for situations in which the Members' approval is expressly required by the Articles or this Agreement; the Managers shall have full, complete, and exclusive authority, power, and discretion to manage and control the Company's business, property, and affairs, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business, property, and affairs.  Except as otherwise specifically set forth herein, any action, consent or approval called for or required by the Managers in this Agreement shall be valid only if approved by all of the Managers then in office (a) at a meeting of the Managers (held in person or by telephonic conference call), (b) by written consent or consents executed and delivered by the Managers, or (c) by email consents sent by the Managers.

**5.5     Powers of the Managers.**  Except as otherwise specifically set forth in this Agreement, the Managers shall have all necessary power to manage and carry out the Company's purposes, business, property, and affairs, including, without limitation, the power to exercise on behalf and in the name of the Company all of the powers described in the Act.

**5.6     Limitations on Power of the Managers.**  The Managers shall not have authority to cause the Company to engage in any of the acts specified in Section 4.6 without first obtaining the approval the requisite approval of the Members.

**5.7     Devotion of Time.**  No Manager is obligated to devote all of such Manager's time or business efforts to the Company's affairs.  Each Manager shall, however, devote whatever time, effort, and skill as the Manager deems appropriate for the Company's efficient operations.

**5.8     Transactions between the Company and a Manager/Member.** Notwithstanding that it may constitute a conflict of interest, the Managers and Members may engage in any transaction with the Company so long as (a) such transaction is not expressly prohibited by this Agreement, and (b) the terms and conditions of such transaction are approved by the Managers and, on an overall basis, are fair and reasonable to the Company.  Any party who objects to a transaction approved by the Managers shall bear the burden of proving that the terms and conditions of such transaction were not fair or reasonable to the Company on an overall basis.

**5.9     Fiduciary Duties; Liability; Reliance of Manager.**  The duty of care owed by the Members and Managers to the Company and its Members consists solely of and is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law. The duty of loyalty owed by the Members and Managers to the Company and its Members consists solely of and is limited to refraining from engaging in fraud or deceit. A Manager who so performs the duties of Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member.  Except as expressly set forth herein, no Member or Manager shall have any fiduciary or other duty to the Company or any Member with respect to the business and affairs of the Company. In performing his or her duties, a Manager shall be entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, of the following persons or

8

groups unless the Manager has knowledge concerning the matter in question that would cause such reliance to be unwarranted and provided that the Manager acts in good faith and after reasonable inquiry:

      **5.9.1**   One or more officers, employees, agents or other strategic advisors of the Company whom the Manager reasonably believes to be reliable and competent in the matters presented;

      **5.9.2**   Any attorney, independent accountant, or other person as to matters which the Manager reasonably believes to be within such person's professional or expert competence; or

      **5.9.3**   A committee upon which the Manager does not serve, duly designated in accordance with a provision of the Articles or this Agreement, as to matters within its designated authority, which committee the Manager reasonably believes to merit competence.

    **5.10**   <u>**Payments to the Managers**</u>.   The Managers shall not be compensated by the Company in their capacity as Managers.

    **5.11**   <u>**Officers**</u>.

      **5.11.1**   The Managers may, from time to time, designate one or more individuals to be officers of the Company (each an "**Officer**").   Any Officers so designated shall have such authority and perform such duties as the Managers may, from time to time, delegate to them. The Managers may assign titles to particular Officers.   Unless the Managers decide otherwise, if the title is one commonly used for officers of a business corporation formed under the California Corporations Code, the assignment of such title shall constitute the delegation to such Officer of the authority and duties that normally are associated with that office, subject to any specific delegation of authority and duties made to such Officer by the Managers.   Any number of offices may be held by the same individual.

      **5.11.2**   If the Managers designate an Officer as the President, such Officer shall be the general manager of the Company and, subject at all times to the control of the Managers, shall have general supervision, direction and control of the day-to-day business and affairs of the Company.

      **5.11.3**   Each Officer shall hold office until his or her successor shall be duly designated and shall qualify, until his or her death, or until he or she shall resign or shall have been removed in the manner hereinafter provided.

      **5.11.4**   Any Officer may resign as such at any time.   Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Company.   The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.   Any Officer may be removed as such, either with or without cause, by the Managers at any time.   Any vacancy occurring in any office of the Company may be filled by the Managers.

      **5.11.5**   Officers shall receive such compensation and rights to reimbursement of expenses as may be determined by the Managers.

9

**5.11.6** Subject to any restrictions imposed by the Managers, any Officer, acting alone, is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts. The authority of an officer or the officers to sign checks, drafts, and other instruments obligating the Company to pay money shall be as set forth in policies adopted by the Managers from time to time. No Officer may sign a contract, agreement or other document unless such action has been authorized by the Managers.

**5.11.7** The Officers of the Company as of the Effective Date are set forth on Exhibit B.

## 6. DISTRIBUTIONS AND ALLOCATIONS

**6.1** **Distributions**. Subject to Section 6.4, applicable law and any limitations contained elsewhere in this Agreement, the Managers shall distribute Distributable Cash to the Members as follows:

**6.1.1** First, the Managers shall make Tax Distributions to all Members within ninety (90) days after the end of each fiscal year. Tax Distributions to each Member under this Section 6.1.1 shall be credited against and shall reduce by a corresponding amount the next distributions to which such Member otherwise would be entitled under the remainder of this Section 6.1; and

**6.1.2** Next, the Managers may elect from time to time to, as the Managers deem appropriate, in the Managers' sole discretion, to make distributions to the Members (a) pro rata in accordance with their Capital Contributions not previously returned to them, until each such Member has received a return of all Capital Contributions not previously returned to such Member, and then (b) to the Members in proportion to their Percentage Interests.

**6.2** **Allocations of Net Loss**. Net Loss shall be allocated to the Members in proportion to their respective Percentage Interests. Notwithstanding the previous sentence, loss allocations to a Member shall be made only to the extent that such loss allocations will not create a deficit Capital Account balance for that Member in excess of an amount, if any, equal to such Member's share of Company Minimum Gain that would be realized on a foreclosure of the Company's property. Any loss not allocated to a Member because of the foregoing provision shall be allocated to the other Members (to the extent the other Members are not limited with respect to the allocation of losses under this Section 6.2). Any loss reallocated under this Section 6.2 shall be taken into account in computing subsequent allocations of income and losses pursuant to this Section 6, so that the net amount of any item so allocated and the income and losses allocated to each Member pursuant to this Section 6, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to this Section 6 if no reallocation of losses had occurred under this Section 6.2.

**6.3** **Allocations of Net Profit**. Subject to Section 6.4, Net Profit shall be allocated (a) first, to the Members in the same ratio as prior Net Losses were allocated, to the extent of such Net Losses, and (b) then to the Members in proportion to their Percentage Interests.

10

Exhibit 1
Page 31

RECEIVER_CVL001300

**6.4    Minimum Gain Chargeback**. Notwithstanding Sections 6.2 and 6.3, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain that is allocable to the disposition of Company property subject to a Nonrecourse Liability, which share of such net decrease shall be determined in accordance with Regulations §1.704-2(g)(2). Allocations pursuant to this Section 6.4 shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.4. The items to be so allocated shall be determined in accordance with Regulations §1.704-2(f). This Section 6.4 is intended to comply with the minimum gain chargeback requirement contained in Regulations §1.704-2(f) and shall be interpreted consistently therewith.

**6.5    Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt**. Notwithstanding Sections 6.2 and 6.3, if there is a net decrease in Company Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Company Minimum Gain attributable to such Member Nonrecourse Debt (which share shall be determined in accordance with Regulations §1.704-2(i)(5)) shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, in subsequent Fiscal Years) in an amount equal to that portion of such Member's share of the net decrease in Company Minimum Gain attributable to such Member Nonrecourse Debt that is allocable to the disposition of Company property subject to such Member Nonrecourse Debt (which share of such net decrease shall be determined in accordance with Regulations §1.704-2(i)(5)). Allocations pursuant to this Section 6.5 shall be made in proportion to the amounts required to be allocated to each Member under this Section 6.5. The items to be so allocated shall be determined in accordance with Regulations §1.7042(i). This Section 6.5 is intended to comply with the Minimum Gain Chargeback requirement contained in Regulations §1.704-2(i) and shall be interpreted consistently therewith.

**6.6    Nonrecourse Deductions**. Notwithstanding Sections 6.2 and 6.3, any nonrecourse deductions (as defined in Regulations §1.704-2(b)(1)) for any Fiscal Year or other period shall be specially allocated to the Members in proportion to their Percentage Interests.

**6.7    Member Nonrecourse Deductions**. Those items of Company loss, deduction, or Tax Code Section 705(a)(2)(B) expenditures that are attributable to Member Nonrecourse Debt for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such items are attributable in accordance with Regulations §1.704-2(i).

**6.8    Qualified Income Offset**. Notwithstanding Sections 6.2 and 6.3, if a Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations §1.704-1(b)(2)(ii)(d)(4), (5), or (6), or any other event creates a deficit balance in such Member's Capital Account in excess of such Member's share of Company Minimum Gain, items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate such excess deficit balance as quickly as possible. Any special allocations of items of income and gain pursuant to this Section 6.8 shall be taken into account in computing subsequent allocations of income and gain pursuant to this Section 6 so that the net amount of any item so allocated and the income, gain, and losses allocated to each Member pursuant to this

11

RECEIVER_CVL001301

Section 6, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Section 6.8 if such unexpected adjustments, allocations, or distributions had not occurred.

**6.9   Allocation of Net Profit and Loss and Distributions for Transferred Membership Interest**. If any Membership Interest is transferred, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned *pro rata* to each day in the particular period of such Fiscal Year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his, her, or its respective Membership Interest at the close of such day.

**6.10   Form of Distribution**. A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money. Except upon a dissolution and the winding up of the Company, no Member may be compelled to accept a distribution of any asset in kind.

**6.11   Return of Distributions**. Except for distributions made in violation of the Act or this Agreement, no Member shall be obligated to return any distribution to the Company, or pay the amount of any distribution for the Company's account or to any creditor of the Company. The amount of any distribution returned to the Company by a Member or paid by a Member for the Company's account or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member.

**6.12   Obligations of Members to Report Allocations**. The Members are aware of the income tax consequences of the allocations made by this Section 6 and hereby agree to be bound by the provisions of this Section 6 in reporting their shares of Company income and loss for income tax purposes.

**7.   TRANSFER AND ASSIGNMENT OF MEMBERSHIP INTERESTS**

**7.1   Transfer and Assignment of Membership Interests**. Except as expressly provided in this Agreement, a Member shall not Transfer any of the Member's Membership Interest, or any interest therein, whether now owned or hereafter acquired, without the prior written consent of the Managers, unless either (i) such Membership Interest is Transferred in accordance with Section 7.2, or (ii) such Transfer and the transferring Member complies with the provisions of Section 7.3. A Member may not undertake any Transfer otherwise permitted under this Section 7.1 unless all of the following conditions are also met: (a) the Company shall have received prior written notice of the proposed Transfer, setting forth the circumstances and details thereof; (b) the Company shall (at its option) have received an attorney's written opinion, in form and substance reasonably satisfactory to the Company, specifying the nature and circumstances of the proposed Transfer, and based on such facts stating that the proposed Transfer will not be in violation of any of the registration provisions of the Securities Act of 1933, as amended, or any applicable state securities laws; (c) the Company shall have received from the Transferee a written consent to be bound by all of the terms and conditions of this Agreement; (d) the Transfer will not result in the loss of any license or regulatory approval or exemption that has been obtained by the Company and is materially useful in the conduct of its business as then being conducted or

12

proposed to be conducted; and (e) the Company is reimbursed upon request for its reasonable expenses in connection with the Transfer.

**7.2**    **Transfers for Estate Planning Purposes and to Existing Members**.

**7.2.1**    A Member may Transfer some or all of his, her or its Membership Interest, or the Economic Interest therein, to a trust, partnership, limited liability company or other entity for the sole benefit of the Member, or any combination between or among the Member, the Member's spouse, and the Member's issue, so long as such Member continues to retain control of such trust, partnership, limited liability company or other entity.  If the Member ceases to retain such control, a new Transfer of such Membership Interest or Economic Interest shall be deemed to have occurred which shall be subject to the provisions of <u>Section 7.1</u>.

**7.2.2**    A Member may Transfer some or all of some or all of his, her or its Membership Interest to an existing Member or to the Company.

**7.3**    **Right of First Refusal**.

**7.3.1**    If a Member shall decide to Transfer all or any part of such Member's Membership Interest ("**Offered Membership Interest**") pursuant to a bona fide offer, such Member shall give written notice, setting forth in full the terms of such bona fide offer and the identity of the offeror(s), to the Company (the "**Notice**").  In the event the Managers agree to purchase such Member's Membership Interest, for thirty (30) days following the receipt of the Notice, the Company shall have the right to purchase any such Offered Membership Interest for the consideration and according to the terms of payment stated in the Notice.  A Manager who is also a Member and who is the transferring Member shall not be entitled to vote with the other Manager(s) in regard to the purchase right accorded the Company hereunder.  Such right shall be exercised by delivering to the transferring Member a written election to purchase the Offered Membership Interest and may not be exercised as to less than all of the Offered Membership Interest proposed to be transferred, unless the non-transferring Member(s) exercise their respective right (as provided for in <u>Section 7.3.2</u>) to purchase any of the Offered Membership Interest not purchased by the Company so that between the non-transferring Members and the Company, all of the Offered Membership Interest is purchased.

**7.3.2**    If such right is not exercised by the Company as to all of the Offered Membership Interest within the thirty (30) day period prescribed above, notice of the Transfer shall be given to all of the non-transferring Members who shall have the right to purchase any portion of the Offered Membership Interest not purchased by the Company, for the consideration and according to the terms of payment upon which the Company was entitled to purchase the Offered Membership Interest. Within thirty (30) days after the mailing of such notice, any non-transferring Member desiring to acquire any part or all of the Offered Membership Interest shall deliver to the Company a written election to purchase the Offered Membership Interest, or a specified portion thereof.   If the right to purchase the Offered Membership Interest is oversubscribed, each non-transferring Member shall have the right to purchase their pro rata portion of the Offered Membership Interest calculated in accordance with the Percentage Interests of the participating non-transferring members.

13

**7.3.3**    If the Company and/or the non-transferring Member(s) elect to purchase all of the Offered Membership Interest, the Company and/or the non-transferring Members shall have the right to purchase the Offered Membership Interest for cash consideration whether or not part or all of the consideration specified in such Notice is other than cash.    If part or all of the consideration to be paid for the Offered Membership Interest as stated in the Notice is other than cash, the price stated in such Notice shall be deemed to be the sum of the cash consideration, if any, specified in the Notice plus the fair market value of the non-cash consideration.    If the parties are unable to agree upon the fair market value of the non-cash consideration, the fair market value shall be determined in good faith by the Managers, which determination shall be conclusive and binding upon all of the parties.

**7.3.4**    If the Company and/or the non-transferring Member(s) have contracted to purchase all of the Offered Membership Interest, the closing of the purchase and sale shall occur on the tenth (10th) business day following the giving by the non-transferring Member(s) and/or the Company to the transferring Member of notice of its election to purchase all of the Offered Membership Interest pursuant to <u>Section 7.3.1</u> or of the final allocation of such Membership Interest pursuant to <u>Section 7.3.2</u>, as the case may be, or at such other time and place as may be mutually agreed to in writing by the Company, the purchasing Member(s) and the transferring Member (the "**Closing**").    At the Closing, the transferring Member shall deliver to the Company and/or the purchasing Member(s), as the case may be, a certificate or certificates (if applicable) representing the Offered Membership Interest duly endorsed for transfer, and the Company and/or the purchasing Members, as the case may be, shall deliver to the transferring Member a wire transfer or certified or cashier's check for the amount of the cash consideration and any other consideration to be paid by the Company and/or the purchasing Member(s) for the Offered Membership Interest.    The transferring Member and the Company and/or the purchasing Members, as the case may be, shall each execute and deliver such other documents as may reasonably be requested by any of the parties mentioned above in connection with the transactions contemplated in this Agreement.

**7.3.5**    In the event the Company and/or the purchasing Members shall fail to tender the required consideration at the Closing, or in the event the Company and/or the purchasing Members, do not elect to purchase all of the Offered Membership Interest within the time periods specified above, then all of the Offered Membership Interest may be transferred by the transferring Member at any time within sixty (60) days from the date of receipt of the Notice by the Company, to the person and for the consideration and upon the terms and conditions specified in the Notice; provided that, all of the provisions of <u>Section 7.1</u> are satisfied.    Any transfer of the Offered Membership Interest after the end of the sixty (60) day period or any change in the terms of the sale from the terms set forth in the original Notice shall require a new notice of intent to transfer delivered to the Company and shall give rise anew to the rights provided in the preceding paragraphs.

**7.4**    <u>**Certain Transfers Relating to Spouses**</u>.    Notwithstanding any other provisions of this Agreement:

**7.4.1**    If, in connection with the divorce or dissolution of the marriage of a Member, any court issues a decree or order that transfers, confirms, or awards all or any portion of such Member's Membership Interest to that Member's spouse, then, notwithstanding that such

14

RECEIVER_CVL001304

transfer would constitute an unpermitted transfer under this Agreement, that Member shall have the right to purchase from his or her former spouse the Membership Interest that was so transferred, and such former spouse shall sell the Membership Interest to that Member at the price set forth in Section 7.8. If the Member has failed to consummate the purchase within sixty (60) days after the award, the other Members shall have the option to purchase from the former spouse the Membership Interest.

       7.4.2  If, by reason of the death of a spouse of a Member, any portion of such member's Membership Interest is transferred to a transferee other than (a) that Member, or (b) a trust created for the benefit of that Member (or for the benefit of that Member and any combination between or among the Member and the Member's issue) in which the Member is the sole Trustee and the Member, as Trustee or individually possesses all of the voting interest included in the Membership Interest, then the Member shall have the right to purchase the Membership Interest from the estate or other successor of his or her deceased spouse or transferee of such deceased spouse. The estate, successor, or transferee shall sell the Membership Interest at the price set forth in Section 7.8. If the Member has failed to initiate the purchase within sixty (60) days after the date of death, the other Members shall have the option to purchase from the estate or other successor of the deceased spouse the Membership Interest.

      7.5    **Purchase of Membership Interest upon Certain Events**. On the occurrence of any of the following events ("**Triggering Events**") with respect to a Member, the other Members shall have the option to purchase all or any portion of the Membership Interest owned by such Member (the "**Selling Member**") at the price and on the terms provided in Section 7.8:

       7.5.1  the Bankruptcy of a Member;

       7.5.2  the winding up and dissolution of an entity Member, or merger or other reorganization of an entity Member as a result of which the entity Member does not survive as an entity; or

       7.5.3  the occurrence of any other event that is, or that would cause, a Transfer in contravention of this Agreement.

      7.6    **Notice of Triggering Event and Certain Other Transfers**. Each Member agrees to promptly give notice of a Triggering Event to the other Members. Each Member also agrees to promptly give notice to the other Members (a) of any event specified in Section 7.4, and (b) when such Member has initiated and consummated a purchase under Section 7.4.

      7.7    **Exercise of Option**. On the receipt of notice of a Triggering Event by a Member as contemplated by the first sentence of Section 7.6, or on receipt of actual notice of any Triggering Event, if earlier, the other Members shall have the right to exercise, for a period of one hundred twenty (120) days thereafter, the option to purchase the Membership Interest at the price and on the terms and conditions set forth in Section 7.8. Commencing sixty days (60) after receipt of a notice under Section 7.6(a) (or sixty (60) days after receipt of actual notice of an event specified in Section 7.4, if earlier) with respect to a Member's spouse, unless the other Members have received the requisite notice under Section 7.6(b), the other Members shall have the option to purchase the Membership Interest at the price and on the terms and conditions set forth in Section 7.8. In each

15

**Exhibit 1**<br>**Page 36**

RECEIVER_CVL001305

case, the Members shall have the right to purchase the selling Member's Membership Interest in the proportion that the Member's Percentage Interest bears to the total Percentage Interests of all of the Members who choose to participate in the purchase.

     **7.8**   **Purchase Price and Terms**. The purchase price for a Membership Interest that is the subject of an option under this Agreement shall be the fair market value of such Membership Interest as determined under this <u>Section 7.8</u>. Each of the selling and purchasing parties shall use best efforts to mutually agree on the fair market value of the Membership Interest. If the parties are unable to so agree within thirty (30) days of the date on which the option is first exercisable, the Managers shall in good faith select an independent appraiser that is, or should be, reasonably acceptable to the selling party. The appraiser shall, within thirty (30) days after its appointment, determine the fair market value of the Membership Interest in writing and submit its report to the parties. The parties shall each pay for an equal share of the fee charged by the appraiser. The option purchase price as so determined shall be payable as follows: (a) twenty percent (20%) of such purchase price shall be payable in immediately available funds at the closing, and (b) the balance of the purchase price shall be payable by the purchasing party's delivery of a promissory note to the selling party. Such promissory note shall be secured by the Membership Interest purchased, shall bear interest at the Prime Rate in effect on the date of the promissory note and shall be payable in equal monthly installments over four (4) years. Such promissory note shall be immediately due and payable in the event that the Company (a) sells substantially all of its assets, or (b) dissolves. At the closing, the selling party shall deliver to the purchasing party such documents as may be reasonably requested by the purchasing party to evidence the transfer of the Membership Interest being purchased.

     **7.9**   **Binding Effect on Transferees**. Any transferee of all or any portion of a Membership Interest shall take subject to the terms of this Agreement, including, without limitation, the restrictions on Transfer and the purchase options set forth in this Agreement.

     **7.10**   **Transfers in Violation of Agreement**. In the event of any Transfer of any Membership Interest in violation of this <u>Section 7</u>, the Company may, at its option: (i) treat such Transfer as null and void; or (ii) treat the transferee as holding only an Economic Interest in the Company, with no right to vote or participate in the Company's management. In such latter case, the transferring Member will cease to hold the voting and information rights relating the transferred Membership Interest and will cease to be a Member with respect to the transferred Membership Interest.

## 8.  ACCOUNTING, RECORDS, AND REPORTING

     **8.1**   **Books and Records**. The Company's books and records shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes. The Company's books and records shall reflect all the Company's transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal office all of the following:

        **8.1.1**   A current list of the full name and address of each Member, together with the Capital Contributions, Capital Account, Membership Interest and Percentage Interest of each Member;

16

8.1.2    A copy of the Articles and any and all amendments thereto;

8.1.3    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

8.1.4    A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

8.1.5    Copies of the Company's financial statements, if any, for the six (6) most recent Fiscal Years; and

8.1.6    The Company's books and records as they relate to the Company's internal affairs for at least the current and past four (4) Fiscal Years.

8.2    **Biennial Statements**.  The Managers shall cause to be filed with the California Secretary of State all statements required under the Act.

8.3    **Tax Matters for the Company Handled by Tax Matters Member**.   The Managers shall from time to cause the Company to make such tax elections as the Managers deem to be in the best interests of the Company and the Members.  The Tax Matters Member, as defined in Tax Code Section 6231, shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith.  The Tax Matters Member shall oversee the Company's tax affairs in the Company's overall best interests.  If for any reason the Tax Matters Member can no longer serve in that capacity, the Members shall select a new Tax Matters Member by the vote of a Majority of the Members.

8.4    **Bank Accounts**.  The Managers shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

9.    **DISSOLUTION AND WINDING UP**

9.1    **Dissolution**.  The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

9.1.1    The entry of a decree of judicial dissolution pursuant; or

9.1.2    The vote of the Members holding sixty-six and two-thirds percent (66.67%) or more of the Percentage Interests held by all Members to dissolve.

9.2    **Articles of Dissolution**.  As soon as possible following the occurrence of any of the events specified in Section 9.1, the Managers shall execute a Articles of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Articles of Dissolution as required by the Act.

17

9.3    <u>Winding Up</u>.  Upon the occurrence of any event specified in <u>Section 9.1</u>, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors.  The Managers, or, if there is then no Managers, the Members, shall be responsible for overseeing the Company's winding up and liquidation, shall take full account of the Company's liabilities and assets, shall either cause its assets to be sold or distributed, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in <u>Section 9.5</u>.  The Persons winding up the Company's affairs shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the Company' records.   The Persons winding up the Company's affairs shall be entitled to reasonable compensation for such services.

9.4    <u>Distributions in Kind</u>.  Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Net Profit or Net Loss that would have resulted if such asset were sold for such value, such Net Profit or Net Loss shall then be allocated pursuant to <u>Section 6</u>, and the Members' Capital Accounts shall be adjusted to reflect such allocations. The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to).   The fair market value of such asset shall be determined by the Managers, or if no Managers are then serving, the Members or, if any Member objects, by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) selected by the Member or a liquidating trustee and approved by the Members.

9.5    <u>Order of Distributions</u>.  In settling accounts upon liquidation, the moneys of the Company shall be applied in the following manner: (a) first, the debts and liabilities of the Company to creditors, including Members who are creditors, shall be paid or otherwise adequately provided for;   (b) next, the remaining assets, if any, shall be distributed to the Members in accordance with their positive Capital Account balances, after taking into account income and loss allocations for the Company's taxable year during which liquidation occurs, until all such Capital Account balances have been reduced to zero; and (c) next, the remaining assets, if any, shall be distributed to the Members in accordance with their Percentage Interests.

9.6    <u>Compliance with Regulations</u>.   All distributions to the Members upon the Company's winding-up and dissolution shall be strictly in accordance with the positive Capital Account balance limitation and other requirements of Regulations §1.704-1(b)(2)(ii)(d).

9.7    <u>Limitations on Payments Made in Dissolution</u>.  Except as otherwise specifically provided in this Agreement, each Member shall be entitled to look solely to the Company's assets for the return of his, her, or its positive Capital Account balance and shall have no recourse for his, her, or its Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against the Members or any other Member.

9.8    <u>Articles of Cancellation</u>.  The Managers shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a Articles of Cancellation of the Articles upon the completion of the winding up of the Company's affairs.

RECEIVER_CVL001308

## 10.    INDEMNIFICATION AND INSURANCE

### 10.1    Indemnification.

**10.1.1** To the fullest extent permitted by law, the Company shall defend and indemnify any Member, Manager or Officer and may (if authorized in the specific case by the Managers) indemnify any other Person who was or is a party, or who is threatened to be made a party, to any Proceeding (as defined below) by reason of the fact that such Person was or is a Member, Manager, officer, employee, or other agent of the Company, or was or is serving at the request of the Company as a director, officer, employee, or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise (each such person being referred to herein as an "agent"), against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred by such Person in connection with such Proceeding, if such Person acted in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, and, in the case of a criminal Proceeding, such Person had no reasonable cause to believe that the Person's conduct was unlawful. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, or that the Person had reasonable cause to believe that the Person's conduct was unlawful. "**Proceeding**" means any threatened, pending, or completed action or proceeding, whether civil, criminal, administrative, or investigative.

**10.1.2** Expenses of each Person indemnified but not entitled to be defended under Section 10.1.1 actually and reasonably incurred in connection with the defense or settlement of a proceeding may be paid by the Company in advance of the final disposition of such proceeding, as authorized by the Managers, upon receipt of an undertaking by such Person to repay such amount if there is a final determination that such individual is not entitled to indemnification as provided herein.

**10.1.3** The Company shall make all indemnification provided for pursuant to this Section 10.1 solely out of Company assets and no Member shall have any personal liability hereunder.

### 10.2    Insurance. The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 10.1 or under applicable law.

## 11.    MISCELLANEOUS

### 11.1    Legal Representation. The Members agree that the law firm of Seed Mackall LLP has represented only Ralph T. Iannelli in connection with this Agreement and has not offered the Company, any other Member or any other person any advice regarding the advisability of entering into this Agreement. Each person executing this Agreement or becoming a Member further acknowledges and agrees that such person: (i) has been advised to obtain independent legal, tax

and accounting advice of such person's own choosing for purposes of representing such person's individual interests with respect to the subject matter hereof; and (ii) has obtained such independent advice as such person has deemed necessary and appropriate in the circumstances.

**11.2    Counsel to the Company.**  Counsel to the Company may also be counsel to any Member or Manager, or any affiliate of a Member or Manager.  The Managers may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction.    Each person executing this Agreement or becoming a Member acknowledges that counsel to the Company does not represent such person in the absence of a clear and explicit written agreement to such effect between such person and such counsel, and that in the absence of any such agreement, counsel to the Company shall owe no duties directly to such person.

**11.3    Complete Agreement.**  This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members.  No representation, statement, condition, or warranty not contained in this Agreement or the Articles will be binding on the Members or have any force or effect whatsoever.  To the extent that any provision of the Articles conflicts with any provision of this Agreement, the Articles shall control.

**11.4    Binding Effect.**    Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members and their respective successors and assigns.

**11.5    Parties in Interest.**  Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and their respective successors and assigns nor shall anything in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

**11.6    Headings.**  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

**11.7    Interpretation.**  If any claim is made by any Member relating to any conflict, omission, or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his, her, or its counsel.

**11.8    Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of California, excluding any laws that direct the application of another jurisdiction's laws.

**11.9    Severability.**  If any provision of this Agreement or the application of such provision to any person or circumstance is held invalid, the remainder of this Agreement or the

application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

**11.10 Notices.** Any notice or other communication to be given hereunder shall be in writing and shall be (as elected by the party giving such notice): (i) personally delivered; (ii) transmitted by postage prepaid registered or certified mail, return receipt requested; (iii) deposited prepaid with a nationally recognized overnight courier service; (iv) transmitted by electronic mail via the Internet (with a copy of such transmission delivered promptly thereafter by registered or certified mail or courier); or (v) transmitted by telecopier (with a copy of such transmission delivered promptly by registered or certified mail or courier). Unless otherwise provided herein, all notices shall be deemed to be effective on: (a) if delivered personally or by courier, the date of receipt (or if delivery is refused, the date of such refusal); (b) if by electronic mail, the date transmitted to the appropriate electronic mail address and an appropriate delivery receipt or other confirmation is received; (c) if by telecopier, the date transmitted to the applicable number and an appropriate delivery receipt or other confirmation is received; or (d) if transmitted by registered or certified mail, three (3) days after the date of posting. Any notice required under this Agreement shall refer to this Agreement, including the specific section under which notice is being given. Notices shall be addressed to the Person for whom intended at the address, facsimile number or e-mail address shown on <u>Exhibit A</u> or such other address, facsimile number or e-mail address, notice of which is given in a manner permitted by this <u>Section 11.10</u>. Any payment required or permitted to be made to any Member under any provision of this Agreement shall be deemed to have been made if delivered or mailed in the manner provided above to the address to which notices, demands, and other communications to such Member are to be delivered pursuant to the foregoing.

**11.11 Amendments.** Except as otherwise expressly provided in this Agreement, all amendments to this Agreement must be in writing and signed by all of the then-current Members.

**11.12 Attorneys' Fees.** If any dispute between the Company and the Members or among the Members results in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs, and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses.

**11.13 Remedies Cumulative.** The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

**11.14 Additional Documents and Acts.** Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

**11.15 Counterparts.** This Agreement (and any amendment hereto or any other document delivered pursuant hereto) may be executed in one or more counterparts and, at such time as each party has signed and delivered at least one such counterpart to the other parties hereto, each counterpart shall be deemed an original and, taken together, the counterparts shall constitute one and the same Agreement. A counterpart signed with an electronic signature, and the transmission of a facsimile (including a PDF or TIF file) of any original signed counterpart of this

RECEIVER_CVL001311

Agreement (or any amendment hereto or any other document delivered pursuant hereto) by telecopier or electronic mail, shall both be treated for all purposes as the delivery of an original signed counterpart.

*(Signature page follows.)*

22

**Exhibit 1**
**Page 43**

RECEIVER_CVL001312

**IN WITNESS WHEREOF,** the parties have executed this Operating Agreement of 915 Elm Avenue CVL, LLC, a California limited liability company, effective as of the date first set forth above.

"MEMBERS"

_____
Ralph T. Iannelli Jr.

_____
William S. Reyner, Jr., Trustee of the
William S. Reyner, Jr. Trust

REYNER FAMILY PARTNERS, L.P.,
a Delaware limited partnership

By:_____
    Name:
    Title:

_____
Ralph T, Iannelli III

_____
William S. Reyner III

SIGNATURE PAGE TO
OPERATING AGREEMENT OF
915 ELM AVENUE CVL, LLC

**Exhibit 1**
**Page 44**

RECEIVER_CVL001313

## EXHIBIT A

to

**Operating Agreement**

of

**915 Elm Avenue CVL, LLC,**

**a California limited liability company**

**As of January 6, 2016**

| Members' Names and Addresses | Percentage Interest | Initial Capital Contribution |
|---|---|---|
| Ralph T. Iannelli Jr.<br>1486 East Valley Rd., 2nd Floor<br>Santa Barbara, CA 93108<br>Facsimile: (805) 565-0993<br>E-mail: ralph@essexcapitalcorp.com | 57.00% | $555,750.00 |
| William S. Reyner, Jr., Trustee of the<br>William S. Reyner, Jr. Trust<br>2895 Hidden Valley Lane<br>SB 903108<br>E-Mail: wsreyner@cox.net | 20.5% | $199,875.00 |
| Reyner Family Partners, L.P.<br>Attn: Brad Taylor<br>1915 Wood Ave.<br>Colorado  Springs, CO 80907<br>E-mail:  taylorbrads@gmail.com | 20.5% | $199,875.00 |
| Ralph T. Iannelli, III<br>266 Penny Lane<br>Santa Barbara, CA 93108<br>E-mail: rtiannelli@gmail.com | 1.00% | $9,750.00 |
| William S. Reyner III<br>6790 Rincon Rd.<br>Carpinteria, CA 93113<br>E-Mail: billyreyner@gmail.com | 1.00% | $9,750.00 |
| Total | 100.00% | $975,000.00 |

EXHIBIT A TO
OPERATING AGREEMENT OF
915 ELM AVENUE CVL, LLC

**Exhibit 1**
**Page 45**

RECEIVER_CVL001314

**EXHIBIT B**
to
**Operating Agreement**
of
**915 Elm Avenue CVL, LLC,**
**a California limited liability company**

**As of the Effective Date**

*Managers and Officers of the Company*

| Name | Title |
|------|-------|
| Ralph T. Iannelli | Manager, President |
| William S. Reyner, Jr. | Manager, Executive Vice President and Secretary |
| Ralph T. Iannelli, III | Senior Vice President — Sales and Business Development |
| William S. Reyner III | Senior Vice President — Operations and Finance |
| Jason Minteer | Vice President |

EXHIBIT B TO
OPERATING AGREEMENT OF
915 ELM AVENUE CVL LLC

Exhibit 1
Page 46

RECEIVER_CVL001315

# EXHIBIT B

## Term Sheet

Exhibit B

Effective on the Settlement Date, the Operating Agreement of 915 Elm Avenue CVL, LLC dated November 23, 2015 shall be amended as specified herein. These amendments and changes specified herein shall be accomplished by an Unanimous Consent of Members which the Reyner Parties and the Receiver agree to execute.

Section 1.29 – Tax Matters Member shall be William S. Reyner, Jr., and his successor shall be Susan Reyner.

Section 2.4 – The Company's principal office shall be located at 915 Elm Avenue, Carpinteria, CA 93103.

Section 5.1 shall acknowledge Ralph T. Iannelli Jr.'s resignation and the Members' agreement that Susan Reyner shall be named as a Manager in addition to William S. Reyner, Jr. In the event of both William Reyner's and Susan Reyner's incapacity or death, William S. Reyner, III shall be the successor Manager.

Section 5.10 will provide that the Managers shall be entitled to a total management fee of $33,000 per year.

Section 7.2 shall include a sentence permitting the transfer of interests held by the William S. Reyner Trust to any beneficiary of the Trust following the death of William S. Reyner, Jr.   This amendment does not affect the Receiver's ability under and pursuant to the terms of the Operating Agreement to transfer his interest in a manner consistent with the rights of the other members, including to a liquidating trust under Section 7.2.1 or to a third party subject to Section 7.1.

Section 11.1 shall be deleted.

Notwithstanding the restrictions on transfers of interests, Geoff Winkler solely in his role as Court-appointed Receiver, and following his written agreement pursuant to Section 4.2.3 of the Operating Agreement of CVL to be bound by the terms of such Agreement, shall be admitted as a non-managing Member in his capacity as Receiver for the benefit of the estate of the Receivership Entities.

Exhibit A shall be revised to reflect the ownership interests specified in Section H of the Settlement Agreement, adjusted by the deletion of the interest of 0.68% currently held by Ralph T. Iannelli, III, provided Mr. Iannelli turns over the interest as demanded by the Receiver.

Exhibit B to the Operating Agreement shall be revised to reflect the following officers and Managers:
President and Manager – William S. Reyner, Jr.

**Exhibit 1
Page 48**

Vice-President and Manager – Susan Reyner and Secretary
Vice-President and General Manager – Jason Minteer

**Exhibit 1**
**Page 49**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 2:18-cv-05008-FMO-AFM |
| Plaintiff, | [PROPOSED] ORDER GRANTING MOTION OF RECEIVER, GEOFF WINKLER, FOR ORDER APPROVING AND AUTHORIZING PERFORMANCE OF SETTLEMENT AGREEMENT |
| v. | |
| RALPH T. IANNELLI and ESSEX CAPITAL CORP., | Date:   October 6, 2022<br>Time:  10:00 a.m.<br>Ctrm:  6D<br>Judge Hon. Fernando M. Olguin |
| Defendants. | |

### <u>ORDER</u>

Before this Court is the Motion of the Court-appointed Receiver, Geoff Winkler (the "Receiver'") for Order Approving and Authorizing Performance of Settlement Agreement (the "Motion").  By the Motion, the Receiver requests that the Court approve and authorize the performance of a Settlement Agreement and Mutual Release ("Settlement Agreement") intended to settle and fully resolve the litigation styled <u>Winkler v. 915 Elm Avenue CVL, LLC</u>, Case No. 2:21-cv-00869-FMO-AFM and <u>Winkler v. Reyner, et al.</u>, Case No. 2:22-cv-0800-FMO-AFM.

This Court, having considered the Receiver's Motion, the supporting Declaration of Geoff Winkler, and any other materials filed in connection with the Motion, and good cause appearing therefor, ORDERS as follows:

4858-1232-2865

1    1.    The Receiver's Motion is GRANTED, in its entirety;

2    2.    The Settlement Agreement, as identified in the Motion, and appended

3 to the supporting Declaration of Geoff Winkler as **Exhibit 1**, is hereby

4 APPROVED; and

5    3.    The Court AUTHORIZES all parties to the Settlement Agreement to

6 perform their obligations under the Settlement Agreement.

7

8    SO ORDERED.

9

10 Dated: _____    _____

11                                    Hon. Fernando M. Olguin
                                       Judge, United States District Court

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4858-1232-2865                            -2-